# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 16, 2010

No. 09-50054

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

GEORGIO RAPHAEL JOB; JAMES ANTHONY

Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas, Austin
USDC No. 1:07-cr-00123-LY-4

Before BARKSDALE, DENNIS, and OWEN, Circuit Judges.

PER CURIAM:[*]

Georgio Raphael Job was convicted of conspiring to violate, and violating, the Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A), as well as of health-care fraud, under 18 U.S.C. § 1347. Job's co-defendant, Dr. James Anthony, was convicted of violating the Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A).

Job challenges his conviction and sentence, claiming: his Sixth Amendment right to counsel under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), was

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

violated because his counsel labored under an actual conflict at trial; in the alternative, his right to counsel was violated because his attorney's closing argument and other failures constituted a "complete denial of counsel" under *United States v. Cronic*, 466 U.S. 648 (1984); in the alternative, at trial and at sentencing, he had ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984); a fatal variance existed between the conspiracy charged in the indictment and the evidence at trial, resulting in his due-process rights being violated; the district court plainly erred by failing *sua sponte* to give a jury instruction on Medicare's safe-harbor provision for the anti-kickback statute; the evidence was insufficient to show he violated 18 U.S.C. § 1347 (health-care fraud); and, his sentence was erroneously calculated based on conspiracy to commit health-care fraud, a crime for which he was not charged, rather than conspiracy to give kickbacks.  Dr. Anthony claims only that the evidence was insufficient to sustain his conviction.  AFFIRMED.

I.

Job owned and operated Richmond Medical Rehab Clinic, a Medicare-licensed provider of durable medical equipment (principally power wheelchairs and accessories) to Medicare beneficiaries.  In 2003, Job entered into an agreement with Denzil Avery:  if Avery could find a doctor willing to write prescriptions for power wheelchairs, Job would split the profits, as well as the costs of recruiting each beneficiary, with Avery.  Job also introduced Avery to Kenny Adebiyi, who operated two durable medical equipment companies of his own, CBCI and Oak Medical.  (Ownership of Oak Medical was in Adebiyi's girlfriend's name, Angela Ernest.)  Avery entered into an agreement with Adebiyi identical to the one Avery had with Job.

Avery found Dr. Anthony, who agreed to write prescriptions for wheelchairs for a fee of $250 per prescription written.  In other words, if Dr. Anthony did *not* write a prescription, he would *not* be paid.

Avery had a network of nursing home workers whom he paid to identify patients entitled to Medicare benefits. The potential beneficiaries would then gather in groups at various public places—in one instance, a hotel; in another, a church. At these gatherings, which typically took place on a Saturday, Dr. Anthony would perform perfunctory "assessments". He would then take to his home the Certificates of Medical Necessity (CMNs; forms required by Medicare). The next week, he would give completed CMNs and prescriptions to Avery to provide to Job. During the entire time Avery worked with Dr. Anthony, Avery never saw a beneficiary for whom Dr. Anthony did *not* prescribe a power wheelchair. Avery paid Dr. Anthony in cash for these prescriptions.

Job filed these CMNs with Medicare, which paid Job, on behalf of the beneficiaries, for the prescribed power wheelchairs. Job's company, Richmond Medical, however, would often deliver scooters instead of power wheelchairs to the beneficiaries. The difference in cost to Job between a scooter and a power wheelchair was around $3,500. Job and Avery split the difference.

In June 2007, Job, Avery, Adebiyi, and Ernest were indicted for conspiracy to violate the Health Care Anti-Kickback Statute, from March 2002 to August 2003, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(A). Job was also charged with paying money to Avery, in the form of kickbacks, to locate, solicit, and recruit Medicare beneficiaries on whose behalf Medicare could be billed for power wheelchairs by Richmond Medical, in violation of 18 U.S.C. § 1320a-7b(b)(2)(A). Job was also charged with three counts of health-care fraud, for fraudulently obtaining money from Medicare by billing for power wheelchairs and related accessories but instead providing lesser-valued scooters, in violation of 18 U.S.C. §§ 1347(1) and (2).

Dr. Anthony was charged with soliciting and receiving cash payments, in the form of a kickback, bribe, or rebate, from Avery for examining one or more beneficiaries, prescribing a power wheelchair, and signing a CMN, in order for

No. 09-50054

the beneficiary to receive a power wheelchair, in violation of 18 U.S.C. § 1320a-7b(b)(2)(A).

Avery pleaded guilty and testified for the Government at the jury trial of Job, Dr. Anthony, and Ernest. Ernest presented witnesses in her defense; Dr. Anthony presented one; Job presented none. Ernest was acquitted, but Job and Dr. Anthony were found guilty of all of the charges against them. Job was sentenced, *inter alia*, to 63 months' imprisonment and to make restitution of $860,096.23. Dr. Anthony was sentenced, *inter alia*, to 18 months' imprisonment and to make restitution of $178,400.53.

## II.

## A.

Job claims: he was denied effective assistance of counsel; he was denied due process due to a fatal variance between the indictment and the evidence at trial; the district court plainly erred by failing *sua sponte* to give a Medicare safe-harbor jury instruction; the evidence was insufficient to show he committed health-care fraud; and, his sentence was erroneously calculated. Primarily at issue are his ineffective-assistance-of-counsel (IAC) claims.

## 1.

Job provides three different bases for IAC: his counsel suffered an actual conflict of interest that adversely affected his performance, such that his counsel was ineffective under *Cuyler*; his counsel's closing argument and other failures amounted to a complete denial of counsel, such that prejudice should be presumed under *Cronic*; and, finally, his counsel's performance at sentencing was ineffective under *Strickland*. Our review is *de novo*. *See Carty v. Thaler*, 583 F.3d 244, 265 (5th Cir. 2009) (reviewing *Strickland* claim *de novo*), *cert. denied* 2010 WL 321327 (3 May 2010); *United States v. Infante,* 404 F.3d 376, 391 (5th Cir. 2005) (reviewing *Cuyler* claim *de novo*); *Childress v. Johnson,* 103 F.3d 1221, 1224 (5th Cir. 1997) ("The ultimate question in this appeal—whether

4

appellant's right to counsel was constructively denied [under *Cronic*]—is a mixed question of law and fact, subject to *de novo* review.").

a.

In order to establish a Sixth Amendment violation under *Cuyler*, Job "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance". *Cuyler*, 446 U.S. at 348; *see also United States v. Burns*, 526 F.3d 852, 856-57 (5th Cir. 2008). Further, he must show: either he did not knowingly, voluntarily, and intelligently waive this conflict, *United States v. Greig*, 967 F.2d 1018, 1021-22 (5th Cir. 1992); or the conflict was "so severe as to render [his] trial inherently unfair", regardless of waiver, *United States v. Vaquero*, 997 F.2d 78, 90 (5th Cir. 1993). Holding that the requisite actual conflict did *not* exist, we do not reach waiver *vel non*.

Job was represented by Craig Washington at trial and sentencing. Prior to trial, the Government moved for the court to inquire into a potential conflict of interest: Washington had an impending trial for aggravated assault with a deadly weapon; one of his attorneys of record was Vivian King; and, King also represented Job's co-defendant, Ernest.

In considering pre-trial motions, the district court was unsure whether a conflict was present. On the day of jury selection, the district judge asked Washington whether he had told Job of the charges against Washington and King's representation of him. Washington had not; therefore, the court gave Washington an opportunity  privately to explain the situation to Job. After Washington did so, the court held a brief *Garcia* hearing, asking Job whether he understood the conflict and whether he waived it. Job replied that he did.

Job contends an actual conflict existed for two reasons: first, Washington failed timely to disclose the pending aggravated-assault charges against him; and second, King's representation of Washington gave him a motive to curry

No. 09-50054

favor with her.  Neither of these reasons is sufficient to show an actual conflict under *Cuyler*.

*Beets v. Scott*, 65 F.3d 1258, 1268-72 (5th Cir. 1995) (en banc), held that, for *Cuyler* to apply (rather than *Strickland*), the actual conflict presented must consist of a conflict of multiple representation, not simply a conflict involving the attorney's self-interest.  As *Beets* explained:

> The position adopted by this court *en banc* may be easily summarized.  *Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context.  First, *Cuyler*, like all the other Supreme Court cases that have discussed a lawyer's conflict of interest, solely concerned the representation of multiple clients. . . .  Second, the demands and reasoning of legal ethics militate against treating multiple representation cases like those in which the lawyer's self-interest is pitted against the duty of loyalty to his client.  Finally, applying *Cuyler* in cases arising from a lawyer's conflict of interest between himself and his client ultimately undermines the uniformity and simplicity of *Strickland*.

65 F.3d at 1265-66 (footnotes omitted).

Job does not contend Washington's performance was conflicted due to his representation of a former or current client; instead, the claimed conflict arises from Washington's self-interest in his representation by King in another case.  Therefore, there was no actual conflict within the meaning of *Cuyler*.

b.

Job's second IAC contention is that, under *Cronic*, he was deprived of effective assistance of counsel.  Under *Cronic*, IAC may be presumed if defendant "is denied the presence of counsel at a critical stage", *Bell v. Cone*, 535 U.S. 685, 695 (2002); if  "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing", *Cronic*, 466 U.S. at 659; or, if "counsel is called

6

upon to render assistance under circumstances where competent counsel very likely could not", *Bell*, 535 U.S. at 696. Job contends he was completely denied counsel due to Washington's closing argument and his failure, *inter alia*, to seek discovery.

Job misapprehends the type of actions by counsel that warrant the *Cronic* presumption. As our court held in *Johnson v. Cockrell*,

> [a] constructive denial of counsel occurs . . . in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are *so egregious* that the defendant was *in effect denied any meaningful assistance at all.* . . . [T]he attorney's failure must be complete. . . . [A] case does not come under *Cronic* merely because counsel failed to oppose the prosecution . . . at specific points in the trial. It is not enough for the defendant to show mere shoddy representation or to prove the existence of errors, omissions, or strategic blunders by counsel. Bad lawyering, regardless of how bad, does not support the per se presumption of prejudice.

301 F.3d 234, 238-39 (5th Cir. 2002) (internal quotations, citations, and footnotes omitted) (first emphasis added; second emphasis in original). At most, for the reasons that follow, Job advances "bad lawyering", *not* the requisite complete failure of representation.

i.

Job claims Washington's closing argument conceded Job's guilt. Admittedly, *if* this were true, it might raise a genuine issue on whether *Cronic* should apply. *See Haynes v. Cain*, 298 F.3d 375, 380 n.6 (5th Cir. 2002) (en banc) (citing *Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991)). The portion of the argument Job relies upon, however, simply does not constitute a concession of guilt. Washington said:

> I told you . . . I was going to try to ask questions . . . so that you can see whether . . . Job did what they said he did and whether you believe that beyond a reasonable doubt.  And I'll be the first to admit that I took a long time doing it sometimes and it seems like maybe I never got there.  But I—and if I took too long in asking questions, I apologize.

Washington's statement is hardly a forced guilty plea and does *not* constitute a complete denial of counsel.

Job further asserts that, in his closing argument, Washington's defense of Ernest, rather than his own client, Job, constituted a complete failure of representation.  Washington stated, *inter alia*:

> Now, all of you—you have children.  And this young lady [Ernest] is a parent's worst nightmare.  You raise them as best you can, and some slick guy comes along talking something fast to them, whispering in their ear, and here they are. . . .  And you can't ever give her her life back.  All  you can do is find her not guilty.  That's the best you can do.

It is not clear why Washington devoted part of his closing argument to Ernest's defense.  But this fairly brief diversion from an otherwise ardent closing argument at worst shows "shoddy representation or . . . the existence of errors, omissions, or strategic blunders by counsel", *not* the kind of complete denial of counsel required for application of the *Cronic* presumption.  *See Johnson*, 301 F.3d at 238.

Finally, Job claims Washington's closing was "rambling" and "discombobulated".  In particular, Job points to Washington's discussion of the Magna Carta ("793 years ago, almost to the day, on a field in a meadow, a man named King John had to come to reckon with the people that he ruled over"), as

well as his complimenting opposing counsel ("Brilliant young lawyer. I was sitting here watching. I was smiling when she was going—I wish I had a daughter like that"). Further, Job especially takes issue with Washington's attempt to discredit Avery, where Washington stated:

> And I pointed it out in your presence. I pointed it out that when he had the opportunity to embellish and make something up, when there was nobody to contradict him, he was the best in the world. He could go on and on about this and that and the other and just pepper it up and season it up like you would a nice piece of chicken or whatever because there's nobody to contradict him. He could remember line, chapter and verse about that motel over there on Old Spanish Trail in Houston. But when I asked him a question about something coming to light where there were some documents to back it up, he didn't have a clue.
>
> And I had to ask him, I said, "What was the difference between the questions I asked you and the questions"—I started out in the very beginning, if you remember, asking him, "Mr. Avery, if you don't understand my question, make sure that I rephrase it or repeat it," because I knew the questions I was asking, at least I thought they was going to be important, not to me, but to you. This ain't important to me. I get to go home. Y'all have to make the decision. When I sit down, I never get to say another word on behalf of Georgio Job. I knew those questions were going to be important. And I got agreement with him, I thought, in the beginning. "Make sure you understand my questions before you answer them," so that if he got caught, he couldn't come back and say, "Mr. Washington, I didn't understand." That's exactly what he did. I'm getting out of breath. I get a little carried away. I talked about who, what, when, where and how.

No. 09-50054

Again, this does not amount to complete denial of counsel. *See United States v. Griffin*, 324 F.3d 330, 364 (5th Cir. 2003) ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the per se presumption of prejudice." (quoting *Gochicoa v. Johnson*, 238 F.3d 278, 284-85 (5th Cir. 2000))).

ii.

Job also claims Washington did not conduct adequate discovery, interview witnesses, explore a plea bargain, or keep him informed. For example, the district court granted inspection and discovery to all defendants. The only evidence Job relies on in support of this claim, however, is his affidavit that he submitted in support of his unsuccessful new-trial motion, filed *after* this appeal. That motion was filed by new counsel for Job, who represent him on appeal.

Job has not appealed the denial of his new-trial motion, and this evidence is not properly before us. *See, e.g.*, FED. R. CRIM. P. 33(b); 16A CHARLES ALAN WRIGHT & ARTHUR P. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3956.1 (4th ed. 2008) ("[O]rdinarily, the court of appeals will not consider matter that was filed with the district court, if at all, after the date of the judgment or order that is challenged on appeal."). Moreover, assuming *arguendo* Washington did fail to act as counsel as claimed, such as failing to conduct discovery, these are the types of errors that do not constitute the *complete* denial of counsel requisite for relief under *Cronic*.

c.

Job's last IAC claim is based on *Strickland*. He maintains: Washington was ineffective at sentencing because he failed to present evidence in support of applying the Medicare safe-harbor provision; and this caused Job to receive a 14-point enhancement for the $860,000 gain he realized by hiring and directing Avery to solicit and recruit beneficiaries.

10

No. 09-50054

"The general rule in this circuit is that [an IAC] claim . . . cannot be resolved on direct appeal when the claim has not been before the district court since no opportunity existed to develop the record on the merits of the allegation." *United States v. Brewster*, 137 F.3d 853, 859 (5th Cir. 1998) (quoting *United States v. Thomas*, 12 F.3d 1350, 1368 (5th Cir. 1994)). Our court "will undertake[] to resolve claims of inadequate representation on direct appeal only in rare cases where the record allowed the court to evaluate fairly the merits of the claim". *United States v. London*, 568 F.3d 553, 562 (5th Cir. 2009) (quoting *United States v. Kizzee*, 150 F.3d 497, 502 (5th Cir. 1998)) (alteration in *London*) (internal quotation omitted).

Obviously, the record is not sufficiently developed to consider this contention.  To do so would require speculating about the reasons for Washington's actions and considering their reasonableness, all without the benefit of evidence from Washington.  Therefore, we decline to consider this *Strickland* claim, without prejudice to Job's raising it in a motion pursuant to 28 U.S.C. § 2255.

2.

For his claim that a fatal variance existed between the conspiracy charge in the indictment and the evidence at trial, Job contends:  the evidence showed, at most, the existence of several *distinct* conspiracies; but, the indictment charged a *single* criminal enterprise. *See Kotteakos v. United States*, 328 U.S. 750, 773 (1946).  Because, as he concedes, Job failed to object on this basis at trial, review is only for plain error. *United States v. Ratner*, 502 F.2d 1300, 1302-03 (5th Cir. 1974).

To establish reversible plain error, Job must show:  an error was committed; it was plain (clear or obvious); and, it affected his substantial rights. *E.g.*, *United States v. Baker*, 538 F.3d 324, 332 (5th Cir. 2008) (citing *United States v. Thompson*, 454 F.3d 459, 464 (5th Cir. 2006), *cert. denied*, 129 S. Ct.

11

962 (2009)). Even if reversible plain error is established, we retain discretion whether to correct it and, generally, will do so only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

To establish that the Government failed to prove the charged conspiracy, Job must show that "the evidence viewed in the light most favorable to the government would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt". *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1126 (5th Cir. 1997). He has failed to do so.

The indictment alleged that Job conspired with Adebiyi, Ernest, and Avery to violate the Medicare Anti-Kickback Act, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A) and 18 U.S.C. § 371. The trial evidence showed: Adebiyi made reservations at a hotel where potential beneficiaries were "assessed" for the benefit of Job; Job introduced Avery to Adebiyi, telling him, "This is my man, and I think you and he can work well together"; and Avery had the same arrangement with Adebiyi that he had with Job. Viewing this evidence in the light most favorable to the Government, we cannot say that a reasonable juror could not find enough commonality to constitute a single conspiracy. Therefore, there was no error.

Furthermore, regardless of whether the Government proved a single conspiracy, it doubtless proved that Job conspired with Avery to violate the Medicare Anti-Kickback Act. Under *United States v. Faulkner*, 17 F.3d 745, 762 (5th Cir. 1994), "where the indictment alleges a single conspiracy and the evidence establishes each defendant's participation in at least one conspiracy a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance". *See also United States v. Morgan*, 117 F.3d 849, 859 (5th Cir. 1997) ("Even were we to conclude that there was a variance, appellants have failed to prove that it affected their substantial rights." (citing *United States v. Guerra-Marez*, 928

12

F.2d 665, 672 (5th Cir. 1991)).  Under joinder and severance principles, Job has not shown "specific and compelling prejudice that resulted in an unfair trial", *Pena-Rodriguez*, 110 F.3d at 1128 (quoting *Faulkner*, 17 F.3d at 759); in fact, Job has not claimed *any* prejudice.  In sum, Job's claim fails under plain error review.

3.

Job's claim that the district court erred by failing *sua sponte* to give a jury instruction on Medicare's safe-harbor provision, 42 C.F.R. § 1001.952(i), was not raised at trial.  Therefore, as Job concedes, this issue is also reviewed only for plain error.

As discussed *supra*, before an error can be plain (clear or obvious) or affect defendant's substantial rights, there must obviously be an error.  In this instance, error exists if the district court failed to give "a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent". *United States v. Branch*, 91 F.3d 699, 712 (5th Cir. 1996) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)).  In other words, error does not exist if, *inter alia*, the instruction at issue "lack[ed] sufficient foundation in the evidence". *Id*. (citing *United States v. Tannehill*, 49 F.3d 1049, 1057 (5th Cir. 1995)).

Job's defense theory pursuant to the Medicare safe-harbor provision, raised for the first time on appeal, warrants some explanation.  First, Job was convicted of violations of 42 U.S.C. § 1320a-7b(b)(2)(A).  That section makes illegal the knowing and willful payment, or offer of payment, of

> remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service

No. 09-50054

> for which payment may be made in whole or in part
> under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b)(2)(A).

The safe-harbor provision modifies the definition of "remuneration" to exclude payments to *bona fide* employees. 42 C.F.R. § 1001.952(i). It relies on 26 U.S.C. § 3121(d)(2) for its definition of employee: "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee". Therefore, whether it was error to fail *sua sponte* to give the safe-harbor instruction depends upon whether there was a sufficient evidentiary foundation for showing Avery and Job were in a *bona fide* common-law employment relationship.

The Supreme Court has explained: where a federal statute adopts a common-law definition of "employee", the term incorporates "the general common law of agency, rather than . . . the law of any particular State". *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 n.3 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989)) (interpreting the definition of "employee" under ERISA) (omission in *Darden*). The key factors include

> the hiring party's right to control the manner and
> means by which the product is accomplished. . . .
> [Those factors also include] the skill required; the
> source of the instrumentalities and tools; the location of
> the work; the duration of the relationship between the
> parties; whether the hiring party has the right to assign
> additional projects to the hired party; the extent of the
> hired party's discretion over when and how long to
> work; the method of payment; the hired party's role in
> hiring and paying assistants; whether the work is part
> of the regular business of the hiring party; whether the
> hiring party is in business; the provision of employee
> benefits; and the tax treatment of the hired party.

14

*Darden*, 503 U.S. at 323-24 (quoting *Reid*, 490 U.S. at 751-752). "[A]ll of the incidents of the relationship must be assessed and weighed with no one factor being decisive". *Id.* at 324 (quoting *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 258 (1968)).

A sufficient foundation for an affirmative defense (such as the safe-harbor exception) consists of "evidence sufficient for a reasonable jury to find in [the defendant's] favor". *Branch*, 91 F.3d at 712 (quoting *Mathews*, 485 U.S. at 63) (alteration in original). In the light of the above-listed factors, it is obvious that such evidence does *not* exist.

Job points to scant evidence that would support an inference that Avery was his employee, rather than his criminal conspirator. He contends that, because he paid Avery as a part of his business' normal business operations, Avery was an employee. Additionally, he contends that Avery's considering himself an employee and being "angry at Job for giving him a 1099 [tax] form [used for reporting income other than wages or salary]" provides sufficient evidence to warrant the instruction.

In contrast, the Government points to overwhelming evidence that Avery was *not* Job's employee. Job did not: control Avery's marketing activities; provide Avery with training; set Avery's hours of work; or require him to work full-time. The bulk of Avery's work, recruiting patients, was not done on Job's business premises. Job did not pay all of the expenses; they were split between Avery and Job. Finally, Job did not pay Avery by the hour, week, or month; payment was made by commission, *i.e.*, kickback. In short, there was *not* enough evidence for a reasonable juror to find Avery was an employee. *See United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001) (unpublished) (holding, in the context of a different safe-harbor provision section of 42 C.F.R. § 1001.952, that, where defendant "failed to present sufficient evidence of this affirmative

defense, the district court did not have to instruct the jury on that defense" (citing *United States v. Bailey*, 444 U.S. 394, 414-15 (1980))).

Therefore, there was no error.  Accordingly, our plain-error review ends.

4.

Job next claims the evidence was insufficient to support his convictions on three counts of health-care fraud under 18 U.S.C. § 1357.  The health-care fraud charges were based on Job's providing lesser-value equipment (scooters) to beneficiaries while billing Medicare for higher-value power wheelchairs and wheelchair accessories.

"When an insufficiency of the evidence claim of error is properly preserved through a motion for judgment of acquittal at trial, review is *de novo*."  *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007) (citing *United States v. Ragsdale*, 426 F.3d 765, 770 (5th Cir. 2005)).  Here, Job preserved this claim by moving for judgment of acquittal both at the close of the Government's case and at the close of defendants' evidence. (Arguably, Job's motion at the close of the Government's case was not a sufficient motion for judgment of acquittal because the only basis presented, without providing any analysis or other discussion, was whether "there [was] sufficient evidence to sustain a conviction".  *See McDowell*, 498 F.3d at 312-13 (discussing requisite specificity of basis of motion). Likewise, his motion at the conclusion of defendants' evidence was simply "for the same reasons . . . stated" in his prior motion.)

Review *de novo* of a sufficiency-of-the-evidence claim determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt".  *United States v. Bellew*, 369 F.3d 450, 452 (5th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 301, 319 (1979)).  "In applying this standard, we view the evidence in the light most favorable to the prosecution and accept all reasonable inferences that tend to support the verdict." *United*

No. 09-50054

*States v. Broadnax*, 601 F.3d 336, 343 (5th Cir. 2010) (quoting *United States v. Ekanem*, 555 F.3d 172, 174 (5th Cir. 2009)).  Along that line, credibility choices are, of course, for the jury.  *E.g.*, *United States v. Mata*, 491 F.3d 237, 242 (5th Cir. 2007).

Job contends that the Government failed to prove he knowingly and willfully provided lesser-value scooters instead of the power wheelchairs for which he billed Medicare.  He does *not* contest that his company did deliver lesser-value equipment rather than the wheelchairs billed to Medicare; rather, Job asserts there was insufficient proof he was aware of the fraudulent billing.

This contention is without merit.  Job was the sole proprietor of Richmond Medical.  In his enrollment agreement with Medicare, he established himself as the sole person responsible for his company's billings.  All funds received from Medicare were deposited directly into Job's bank account, for which he was the *only* signatory.  Further, Richmond Medical retained the original CMNs submitted to Medicare, which showed that Medicare was billed for the wheelchairs. Therefore, the evidence was sufficient for a reasonable juror to find that Job was aware that Medicare was billed for wheelchairs.

The evidence was also sufficient for a rational trier of fact to find that Job was aware that scooters, rather than wheelchairs, were delivered to the beneficiaries.  Again, because Job was the sole proprietor of Richmond Medical, and as otherwise discussed *supra*, a reasonable juror could find Job was aware scooters were delivered by his company.

5.

Finally, Job contends the court erred in calculating his sentence.  He asserts that the court calculated his sentence based on conspiracy to commit health-care fraud, a crime for which he was not charged. (As discussed, the conspiracy charged in the indictment concerned paying kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).)  He maintains that, to establish a loss to

Medicare based on fraud, the Government must establish: the beneficiaries who received power wheelchairs were not entitled to them; and Job knew these beneficiaries were not entitled to them when Medicare was billed.

Job's assertion is without merit. His sentence, *inter alia*, was based on Guideline § 1B1.3(a) (relevant conduct), which allows being sentenced based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity". As a result of the application of this Guideline, Job received a 14-level adjustment to his offense level for the improper benefit derived from Medicare—$860,096.23. Therefore, at issue is whether Job's sentence, based on the application of § 1B1.3, was proper.

Job states our review is only for plain error; but we, of course, determine our standard of review. *E.g.*, *United States v. Rodriguez*, 602 F.3d 346, 351 (5th Cir. 2010). We need not determine whether this issue was forfeited. Because, for the following reasons, we find no error, Job's claim fails.

Along that line, an amount-of-loss calculation is a factual decision reviewed only for clear error. *E.g.*, *United States v. Reasor*, 541 F.3d 366, 369 (5th Cir. 2008) (citing *United States v. Humphrey*, 104 F.3d 65, 71 (5th Cir. 1997)). The "amount of loss need not be determined with precision". *Id.* (citing *United States v. Edwards*, 303 F.3d 606, 645 (5th Cir. 2002)). "[A]ll that is necessary is that the finding be plausible in light of the record as a whole". *Id.* (quoting *Edwards*, 303 F.3d at 645) (internal quotations omitted).

As stated *supra*, contrary to Job's assertion that the Government must show he knew the beneficiaries were not entitled to the power wheelchairs, under the applied Guideline, Job can be sentenced on the basis of any reasonably foreseeable acts which are part of a common scheme or plan. U.S.S.G. § 1B1.3(a). An offense constitutes part of a common scheme or plan if it is "substantially connected to [other acts] by at least one common factor, such as

common victims, common accomplices, common purpose, or similar modus operandi". U.S.S.G. § 1B1.3, comment. (n.9).

The presentence investigation report (PSR) contained statements that Job, Avery and Adebiyi were involved in a conspiracy involving health-care fraud and anti-kickback violations. The PSR also stated: Avery was paid by Job for "marketing consulting"; and Job directed Avery to recruit patients for his company and provided money to Avery, so that Avery could pay the recruiters and the physician after the patients were examined; and Avery hired recruiters to solicit patients for the purpose of providing a wheelchair, with the knowledge that Job and Adebiyi's companies were submitting fraudulent billings to Medicare. According to the PSR, "[a]fter beneficiaries received a wheelchair, Job paid Avery a commission of between $1,200 and $1,500 per patient".

Further, the PSR stated that most of the recipients "did not need the wheelchairs or use them with regularity". Consequently, the PSR established that part of the common scheme of which Job was a participant was to recruit individuals with valid Medicare numbers, who did not have the requisite medical need for a power wheelchair. Because no testimony or other evidence was submitted to rebut the information in the PSR, the district court was free to adopt the PSR's findings without further inquiry or explanation. *United States v. Mir*, 919 F.2d 940, 943 (5th Cir. 1990) (citing *United States v. Mueller*, 902 F.2d 336, 346 (5th Cir. 1990)).

Job's involvement in the fraud falls within the ambit of a common scheme or plan. His connection with Avery and Dr. Anthony was clearly laid out both at trial and in the PSR. Accordingly, the Government was not required to prove that Job had personal knowledge that the recipients were not entitled to the wheelchairs. Rather, the Government need only show it was reasonably foreseeable to Job that recipients were fraudulently being prescribed wheelchairs. Certainly, the statements in the PSR and the evidence introduced

19

at trial established, by a preponderance of the evidence, that the fraudulent claims to Medicare were reasonably foreseeable to Job. Therefore, the court did *not* err in calculating his sentence based on that relevant conduct.

### B.

Dr. Anthony's only challenge to his conviction for violation of the Medicare Anti-Kickback Act is that there was insufficient evidence to support his conviction. He contends the Government failed to prove he knowingly and willfully violated the law by receiving payments intended to induce referrals.

Because, in district court, Dr. Anthony also properly preserved this claimed error, the standard of review is, as stated *supra*, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt". *Bellew*, 369 F.3d at 452 (quoting *Jackson*, 443 U.S. at 319). As also discussed *supra*, "we view the evidence in the light most favorable to the prosecution and accept all reasonable inferences that tend to support the verdict". *Broadnax*, 601 F.3d at 343 (quoting *Ekanem*, 555 F.3d at 174). Again, in that regard, credibility choices are for the jury. *Mata*, 491 F.3d at 242. Pursuant to this standard of review, it is obvious there was sufficient evidence from which a reasonable juror could find Dr. Anthony possessed specific intent.

Dr. Anthony explained to Job that he was aware of Medicare's procedures and requirements, particularly the requirement of a CMN; therefore, the evidence showed he was aware of the law's requirements. Further, the evidence showed Dr. Anthony "assessed" beneficiaries in a perfunctory fashion. Avery testified that, at the Smithville hotel, Dr. Anthony would "ask [the beneficiaries] a few questions, tap them in the back, hit them on their knee, take their blood pressure, and [say] next". He conducted no further tests.

Moreover, the nature of his assessments showed his guilty knowledge. His "assessments" of beneficiaries took place in group homes, hotels, and, in one

instance, a church. Dr. Anthony told Avery he needed to hide where the assessments took place, and he subsequently produced a prescription pad with Job's Richmond Medical name and address in the heading, despite not conducting "assessments" there.

Moreover, the beneficiaries' lack of medical need supports the inference that Dr. Anthony was motivated by the kickbacks and intended to violate the law by writing prescriptions. In order to legitimately qualify for a power wheelchair, a person was required to have a muscular problem that would prevent him from being able to operate a manual wheelchair. Avery testified that, for the beneficiaries in Smithville: "Nobody came in wheelchairs. Nobody came on crutches. They all walked in; they all got out of cars." In fact, Avery testified that, on one occasion, "Dr. Anthony got so angry because he was seeing a lot of patients and they all [came] walking in there and he instructed me to tell the marketers, '[L]ook, you need to tell these damn people they need to bend over or walk slow or act like they are limping or something, they got to do their part'".

Finally, Dr. Anthony was paid only for patients for whom he wrote a prescription for a power wheelchair; if they did not pass his "assessment", he was not paid his $250 fee. He prescribed a wheelchair for *every* beneficiary he "assessed". He was paid in cash for these assessments, and he did *not* bill Medicare for them. He told Avery he did not mind taking long-distance trips to see large groups of beneficiaries because the money he received was greater than what he would receive from Medicare.

Again, in the light of the foregoing, a reasonable juror could have found beyond a reasonable doubt that Dr. Anthony possessed the requisite intent.

### III.

For the foregoing reasons, the judgments are AFFIRMED.

21