# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 28, 2013

No. 12-30807

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

CHIKENNA D. JONES; HENRY L. JONES,

Defendants – Appellants

consolidated with
No. 12-30808

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

CHIKENNA D. JONES,

Defendant – Appellant

Appeals from the United States District Court
for the  Middle District of Louisiana

Nos. 12-30807 & 12-30808

Before JOLLY, DeMOSS, and SOUTHWICK, Circuit Judges.

DeMOSS, Circuit Judge:

Henry Jones appeals the district court's denials of his motions to dismiss an indictment on double jeopardy and multiplicity grounds. Chikenna Jones appeals the denials of motions to substitute counsel she filed in separate cases. For the reasons stated below we AFFIRM.

## BACKGROUND

Henry Jones ("Henry") and Chikenna Jones ("Chikenna") engaged in Medicare fraud for years. The government indicted Henry in three separate cases: United States v. Nnanta Felix Ngari, et al., ("the Ngari case"); United States v. Henry L. Jones, et al., ("the Jones case"); and United States v. Shedrick O. McKenzie, et al., ("the McKenzie case"). The government indicted Chikenna in the Jones and McKenzie cases.

The following excerpts from the indictment in the McKenzie case[1] provide relevant background for all three cases:

> 1.    The Medicare Program ("Medicare") was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled . . . . Individuals who receive benefits under Medicare were commonly referred to as Medicare "beneficiaries."
>
> . . . .

---

[1] Indictment, United States v. Shedrick O. McKenzie, et al., No. 3:11-cr-9 (M.D. La. Feb. 2, 2011) ECF No. 1.

Nos. 12-30807 & 12-30808

3.      Part B of the Medicare Program was a medical insurance program that covered, among other things, certain durable medical equipment ("DME").[2]

4.      For Louisiana beneficiaries, Medicare Part B insurance covering DME and related health care benefits, items, and services was administered by Cigna Government Services ("Cigna") . . . . Among Cigna's responsibilities, it received, adjudicated, and paid the claims submitted to it by Medicare beneficiaries, physicians, and suppliers of health care items and services.

5.      DME companies, physicians, and other health care providers that sought to participate in Medicare Part B and bill Medicare for the cost of DME and related benefits, items, and services were required to apply for and receive a "supplier number." The supplier number allowed a DME company to submit bills, known as "claims," to Medicare to obtain reimbursement for the cost of DME and related health care benefits, items, and services that a DME company had supplied to beneficiaries.

6.      To receive payment from Medicare, a DME company, using its supplier number, would submit a health insurance claim form . . . . The [claim form] required DME companies to provide certain [claim specific information].

7.      Medicare, through Cigna, would generally pay a substantial portion of the cost of the DME or related health care benefits, items, and services if they were medically necessary and ordered by licensed doctors or other licensed, qualified health care providers.

8.     Payments under Medicare Part B were often made directly to the DME company. For this to occur, the beneficiary would assign the right of payment to the DME company or other health care provider. Once such an assignment took place, the DME company

---

[2] Examples of DME include power wheel chairs, back and knee braces, and orthotics.

or other health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

The Ngari indictment[3] included one count of Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349 "[b]eginning at least on or about December 2, 2003, and continuing through on or about March 7, 2009," and one count of Conspiracy to Defraud the United States and to Pay Health Care Kickbacks in violation of 18 U.S.C. § 371 "[b]eginning at least on or about March 16, 2004, and continuing through at least on or about January 26, 2007[.]"

The Ngari indictment focused on a business called Unique Medical Solution, Inc. ("Unique") which was allegedly owned and operated by Nnanta Felix Ngari ("Felix Ngari"). The government alleged that Unique "was purportedly engaged in the business of providing DME to Medicare beneficiaries" and that "Unique had a Medicare provider number, and was eligible to receive reimbursement from Medicare for DME that was supplied to beneficiaries if it was medically necessary." The government alleged that Sofjan Lamid "was a physician . . . who wrote prescriptions ordering medically unnecessary DME that served as the basis for certain of Unique's claims to Medicare." The government also alleged that Henry and Ernest Payne were "patient recruiter[s] who referred beneficiaries to Unique so that claims for medically unnecessary DME could be filed with Medicare." The government asserted that Felix Ngari, Henry, and Ernest Payne "would agree to pay kickbacks . . . in return for the referral of Medicare beneficiaries whose names would be used to submit claims for medically unnecessary DME." Henry was convicted of both conspiracy counts in the Ngari case.

---

[3] Indictment, United States v. Nnanta Felix Ngari, et al., No. 3:10-cr-60 (M.D. La. Apr. 28, 2010), ECF No. 1.

Nos. 12-30807 & 12-30808

The Jones case was the next case to be filed. In relevant part, the superseding indictment in the Jones case[4] alleged a conspiracy which violated 18 U.S.C. § 1349 "[b]eginning on or about June 24, 2004, and continuing through on or about November 22, 2009," and a conspiracy which violated 18 U.S.C. § 371 "[b]eginning at least on or about June 24, 2004, and continuing through at least on or about October 8, 2009[.]" The superseding indictment focused on four entities, Healthcare 1, LLC ("Healthcare 1"); Lifeline Healthcare Services, Inc. ("Lifeline"); Medical 1 Patient Services, LLC ("Medical 1"); and Rose Medical Equipment, Inc. ("Rose Medical"), which were "purportedly engaged in the business of providing DME to Medicare beneficiaries[,] . . . had [] Medicare provider number[s]," and were "eligible to receive payments from Medicare for" the medically necessary DME they provided. The government alleged that Henry and Chikenna were "corporate officer[s] for and operator[s] of Healthcare 1, Lifeline, and Medical 1[,]" and that they "purchase[d] and t[ook] control of Rose Medical." The government asserted that Sofjan Lamid and Jo Francis were doctors who "would provide prescriptions to patient recruiters for medically unnecessary DME[.]" The government alleged that Henry and Chikenna "paid kickbacks to patient recruiters . . . in exchange for names and billing information of Medicare beneficiaries, as well as fraudulent prescriptions, for the purpose of billing the Medicare program for medically unnecessary DME[.]" The government accused nine other co-defendants of working as patient recruiters for one or a combination of Healthcare 1, Lifeline, and Medical 1. The

---

[4] Superseding Indictment, United States v. Henry L. Jones, et al., No. 3:10-cr-104 (M.D. La. Feb. 10, 2011), ECF No. 196.

government also accused Henry and Chikenna of submitting fraudulent Medicare claims through Rose Medical.

In the Jones case, Chikenna filed a motion to substitute retained counsel for her court-appointed counsel, and the district court denied her motion. Thereafter, both Henry and Chikenna pleaded guilty in the Jones case. Henry did not appeal in the Jones case. Chikenna appealed the district court's denial of her motion to substitute counsel in the Jones case.

The last case to be filed was the McKenzie case. In relevant part, the indictment in the McKenzie case[5] also alleged two conspiracies, one which violated 18 U.S.C. § 1349 "[b]eginning on or about October 28, 2004, and continuing through on or about October 25, 2010," and another which violated 18 U.S.C. § 371 "[b]eginning at least on or about December 22, 2006, and continuing through at least on or about May 7, 2010[.]" The indictment focused on a business called McKenzie Healthcare Solutions, Inc. ("Solutions"). The government alleged that "Shedrick O. McKenzie was a corporate officer for and operator of [Solutions]." The government asserted that Jo Francis was a doctor "who wrote prescriptions ordering medically unnecessary DME for Medicare beneficiaries, for the purpose of having [Solutions] submit claims to Medicare and receive payments from Medicare." The government further alleged that "[f]rom in or around January 2010, through at least in or around October 2010, [Henry] was an operator of [Solutions]." The government accused Chikenna of being "a corporate officer for and operator of [Solutions]" during the same time period during 2010. The government also accused the pair of paying "kickbacks

---

[5] Indictment, United States v. Shedrick O. McKenzie, et al., No. 3:11-cr-9 (M.D. La. Feb. 2, 2011) ECF No. 1.

to patient recruiters . . . in exchange for the names and billing information of Medicare beneficiaries, as well as fraudulent prescriptions, for the purpose of billing the Medicare program for medically unnecessary DME through [Solutions]."

Prior to trial, Henry filed a motion to dismiss the indictment in the McKenzie case based on double jeopardy and multiplicity grounds which the district court denied. Thirteen days before trial in the McKenzie case, Chikenna filed a motion to substitute retained counsel for her court appointed counsel in both the Jones and McKenzie cases. The district court denied both motions. Thereafter, both Henry and Chikenna were convicted by a jury in the McKenzie case.

After the trial in the McKenzie case, Henry filed a second motion to dismiss which the district court denied. Henry appealed the denial of his motions to dismiss, and Chikenna appealed the denial of her motions to substitute.

**I.    Henry's Appeal**

Henry argues that the district court erred when it failed to dismiss his charges in the McKenzie case. Henry's primary argument is that his prosecution in the McKenzie case violated the Double Jeopardy Clause of the U.S. Constitution because the government charged him for the same conduct he was already convicted of in the Ngari case. Henry also mentions in passing that the charges were multiplicitous. The government denies that the charges in the McKenzie case violated the Double Jeopardy Clause or were multiplicitous.

## A.    Double Jeopardy

"We review the district court's denial of a motion to dismiss an indictment on double jeopardy grounds *de novo* and accept the underlying factual findings of the district court unless clearly erroneous." *United States v. Gonzalez*, 76 F.3d 1339, 1342 (5th Cir. 1996) (citations omitted).

The Fifth Amendment of the United States Constitution states in part that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. CONST. amend. V.  "The Fifth Amendment's Double Jeopardy Clause protects against a second prosecution for the same offense after conviction." *United States v. El-Mezain*, 664 F.3d 467, 546 (5th Cir. 2011) (internal quotation marks and citations omitted).

Generally, when a defendant pleads guilty, jeopardy attaches at the time the guilty plea is accepted.  *United States v. Kim*, 884 F.2d 189, 191-92 (5th Cir. 1989).  "For a jury trial, jeopardy attaches when the jury is empaneled and sworn." *United States v. Stricklin*, 591 F.2d 1112, 1120 (5th Cir. 1979).

Henry was a defendant in three separate cases.  In the Ngari case, jeopardy attached when the jurors were sworn on August 1, 2011.  In the McKenzie case, jeopardy attached on November 7, 2011, when the jurors were sworn.  In the Jones case, jeopardy attached when Henry's plea was accepted on January 12, 2012.

Based on the timing of jeopardy attaching in these three cases, the government argues that the Jones case could not create a double jeopardy violation in the McKenzie case.  The government's assessment is correct.  At the time jeopardy attached in the McKenzie case, jeopardy had already attached in the Ngari case, but jeopardy had not attached in the Jones case.  Therefore, we

Nos. 12-30807 & 12-30808

will examine only whether the McKenzie indictment constituted a double jeopardy violation with respect to the conviction in the Ngari case.[6]

Double jeopardy claims involve a burden shifting analysis. *El-Mezain*, 664 F.3d at 546 (citation omitted). "If a defendant comes forward with a prima facie nonfrivolous double jeopardy claim," the government must then prove by a preponderance of the evidence that the indictments charge separate crimes. *Id.* (internal quotation marks and citation omitted); *United States v. Delgado*, 256 F.3d 264, 272 (5th Cir. 2001). The parties do not address whether Henry has made a prima facie non-frivolous double jeopardy claim. "The defendant can establish a *prima facie* non-frivolous double jeopardy claim through indictments or other documentation to establish the earlier charges, or even through his own testimony." *United States v. Ellender*, 947 F.2d 748, 759 (5th Cir. 1991) (citation omitted). The record in the Ngari case clearly establishes the earlier charges.

"In a conspiracy case, the central issue for double jeopardy purposes is whether there was one agreement and one conspiracy or more than one agreement and more than one conspiracy." *El-Mezain*, 664 F.3d at 546 (citation omitted).

> To determine whether the alleged conspirators entered into more than one agreement, we evaluate five factors: 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offense charged that indicates the nature and scope of the activity that the government sought to punish in

---

[6] To the extent that Henry is arguing that the Jones case is connected to both the Ngari and McKenzie cases and therefore forms a link between the Ngari and McKenzie cases, we reject that argument. We need not reach the issue of whether it is permissible to rely on a third case to demonstrate a connection between two other cases because it would not change our conclusion that the Ngari and McKenzie cases involved discrete conspiracies.

each case; and 5) places where the events alleged as part of the conspiracy took place.

*Delgado*, 256 F.3d at 272 (citation omitted). "No one factor . . . is determinative; rather all five factors must be considered in combination." *Id.* (internal quotation marks and citations omitted).[7]

### 1. Timing

The Ngari indictment alleged two conspiracies. The government alleged that the first conspiracy ran from December 2003 to March 2009, and the second conspiracy fell temporally within the time frame of the first conspiracy. The McKenzie indictment alleged two conspiracies as well. The government alleged that the first ran from October 2004 to October 2010, and the second conspiracy fell within the time frame of the first conspiracy. At first blush, there appears to be a major overlap between the timing of the crimes charged in the Ngari and McKenzie indictments. But the government points out that Henry's conduct in the McKenzie case did not overlap temporally with his conduct in the Ngari case. Specifically, the conspiracy in the Ngari case covered conduct only through March 2009. But the portions of the McKenzie indictment which refer to dates

---

[7] Henry cites *United States v. Becker*, 569 F.2d 951, 960 (5th Cir. 1978), for the proposition that the main factors for ascertaining whether there is a single conspiracy are "the existence of a common goal, the nature of the scheme, and an overlapping of participants in the various dealings." Henry also cites *United States v. Ruigomez*, 576 F.2d 1149, 1151 (5th Cir. 1978), a double jeopardy case in which this court concluded there was a single conspiracy because "the participants shared a continuing, common goal of buying and selling marijuana for profit; the operations of the conspiracy followed an unbroken and repetitive pattern; and the cast of conspirators remained much the same." The five-prong test and the test advanced by Henry are largely the same. The primary difference is that the five-prong test focuses on the nature and scope of the conduct the government was trying to stop, but the test advocated by Henry focuses on the goals of the conspirators. We will use the five-prong test, but, as explained below, even if we consider the goals of the conspirators, it would not change our conclusion.

which overlap with the dates in the Ngari indictment were directed at the McKenzie conspirators as a group.   When the McKenzie indictment focused on the actions of Henry specifically, those actions allegedly began in January 2010. Therefore, there is no overlap in the timing of the actions for which Henry was charged in the Ngari and McKenzie indictments, and he was the only conspirator who was indicted in both cases. After considering the arguments of the parties, we find that the timing factor indicates that the Ngari and McKenzie cases involved separate conspiracies.

**2.     Co-conspirators**

As to the persons acting as co-conspirators, there were four defendants in the Ngari case and six defendants in the McKenzie case.   Henry was the only defendant who was charged in both cases.

The government asserts that Henry was a recruiter in the Ngari case and a company operator in the McKenzie case and cites *El-Mezain,* 664 F.3d at 547, for the propositions that the overlap of "key personnel" is more important than the overlap of other players and that the roles played are also important.   This court has stated:

> The nature of the overlapping co-conspirators' participation is relevant to finding a single conspiracy, especially when the co-conspirators are the central characters, or the key personnel in both cases.  If the central figures of the cases are different, or if they serve different functions for purposes of the conspiracies, it is less likely that there is a single agreement.

*El-Mezain*, 664 F.3d at 547 (internal quotation marks and citations omitted).

The district court stated that Felix Ngari "may fairly be deemed the central figure in the [Ngari] conspiracy[,]" but on appeal Henry has not pointed to any evidence that Felix Ngari had any involvement in the McKenzie case.

11

Nos. 12-30807 & 12-30808

The government argues that Shedrick McKenzie was the "central organizing figure[]" in the McKenzie case. We agree that Shedrick McKenzie was a key figure in the McKenzie case, and Henry has failed to identify evidence that Shedrick McKenzie was involved in the Ngari case. Furthermore, it is significant that Henry was indicted for being a recruiter in the Ngari case, but he was indicted for being an operator of a corporation in the McKenzie case. After considering the co-conspirators in the Ngari and McKenzie cases and their alleged roles, we find that this factor indicates that there were two separate conspiracies.

**3.    The Statutory Offenses Charged in the Indictments**

Turning to the statutory offenses charged in the indictments, the statutory conspiracy charges in the McKenzie case are identical to the statutory conspiracy charges in the Ngari case.

The government cites this court's opinion in *El-Mezain,* which observed that even when the charged statutory offenses charged are the same or similar, "we must be mindful that '[i]t is possible to have two different conspiracies to commit exactly the same type of crime.'" *Id.* at 548 (quoting *United States v. Thomas*, 759 F.2d 659, 666 (8th Cir. 1985)). Ultimately, the one-hundred percent overlap of the charged conspiracy offenses in the Ngari and McKenzie cases causes this factor to support a finding that there was a single conspiracy.

**4.    The Nature and the Scope of the Activity the Government Sought to Punish and the Goal of the Conspirators.**

With respect to the nature and scope of the activity the government sought to punish in each case and the goals of the conspirators, the Ngari and McKenzie cases are readily distinguishable.

Nos. 12-30807 & 12-30808

Henry would have us focus on the goals of the conspirators. In the district court Henry argued that in all three cases he was "charged with causing unnecessary DME equipment to be provided to Medicare beneficiaries . . . and . . . paying illegal healthcare kickbacks in furtherance of that scheme" and he asserted "[t]here was a common goal in all three charged conspiracies of obtaining prescriptions for medically unnecessary DME by paying kickbacks to recruiters and physicians in order to bill Medicare for that equipment."[8] Furthermore, Henry argues that the government admitted there was a single conspiracy when it made certain statements such as the "somewhat overlapping nature" of the indictment. Appellant's Br. at 6-7.

The government argues that the goals of the conspiracies were different because the goal of the Ngari conspiracy was "the enrichment of [Felix] Ngari and the persons associated with Unique[,]" and the goal of the McKenzie conspiracy was "the enrichment of [Shedrick] McKenzie and the persons associated with . . . [Solutions][.]" Appellee's Br. at 15. The government further argues that the Medicare fraud charged in the McKenzie case had gone on for years before Henry became involved with that conspiracy and that Henry's "joining the conspiracy at [Solutions] in 2010 did not transform those two independent conspiracies into a single conspiracy." *Id.* at 19. The government disputes Henry's suggestion that it admitted that there was a single conspiracy and points out that the cited evidence references the Jones and McKenzie cases. The government cites *United States v. Felix*, 503 U.S. 378, 386 (1992), where the Supreme Court stated: "[O]ur precedents hold that a mere overlap in proof

---

[8] Memorandum in Support of Defendant Henry Jones' Motion to Dismiss at 8, 12, United States v. Shedrick O. McKenzie, et al, No. 3:11-cr-9, (M.D. La. Dec. 29, 2011), ECF No. 179-1.

13

between two prosecutions does not establish a double jeopardy violation."

First, we address Henry's claim that the government admitted there was a single conspiracy.   As the government points out, the portions of the record which Henry cites for the proposition that the government admitted that there was a single conspiracy actual refer to connections between the Jones and McKenzie cases.   Crucially, those portions of the record do not address connections between the Ngari and McKenzie conspiracies.  *See* ROA at 340, 377.   In short, Henry has not identified any evidence that the government admitted the Ngari and McKenzie cases involved the same conspiracy.

Next, we address the goals of the conspiracies.   Henry would have us characterize the goals of the conspiracies too broadly.  We cannot divorce our evaluation of the goals of the conspiracies from the factual allegations in the indictments.  The goal in Ngari was to enrich those associated with Unique and the goal in McKenzie was to enrich those associated with Solutions.  This view is supported by the reality that Henry was not involved with the acts charged in the McKenzie case until that conspiracy had been ongoing for years.  We find that the goals of the Ngari and McKenzie conspiracies were different.

Similarly, the nature and scope of the conduct the government was trying to punish suggest that there were two different conspiracies.  Although the nature of the conduct was much the same, the scope of the two conspiracies was different.  In the Ngari case the government was targeting a conspiracy which centered on Unique, but in the McKenzie case the government was targeting a conspiracy which centered around Solutions.

Whether we focus on the goals of the conspirators or the conduct the government was targeting we conclude that both analyses reach the same result. This factor indicates that there were two separate conspiracies.

**5.    Place Where the Events Alleged as part of the Conspiracies Occurred**

The government admits that "the events primarily transpired in the same general area of Louisiana" and relies on the other factors to show that there are different conspiracies. Appellee's Br. at 14. This factor supports a finding that there was a single conspiracy.

**6.    Double Jeopardy Conclusion**

After considering each of the five factors, only two factors, the location of the events and the statutory crimes charged, support a finding that there was a single conspiracy. The timing, the participants, the goals of the conspirators, and the nature of the conduct the government was trying to stop, support a finding that there were two conspiracies. We find that the conspiracies in the Ngari and the McKenzie cases were two separate conspiracies. Therefore, the government's prosecution of Henry in the McKenzie case after he was convicted in the Ngari case, did not constitute a double jeopardy violation.

**B.    Multiplicity**

We now consider whether the McKenzie indictment violated the prohibition on multiplicity. "We review issues of multiplicity *de novo*." *United States v. Reedy,* 304 F.3d 358, 363 (5th Cir. 2002) (citation omitted). "Multiplicity is the charging of a single offense in several counts. The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *Id*. (internal quotation marks and citations omitted).

Nos. 12-30807 & 12-30808

Henry asserts in passing that by charging him for separate conspiracies the government has violated the prohibition on multiplicity. The government cites *Albernaz v. United States*, 450 U.S. 333 (1981), for the proposition that the McKenzie indictment is not multiplicitous because each conspiracy statute contains an element which is not contained in the other statute. In *Albernaz,* the Supreme Court stated:

> The test articulated in *Blockburger v. United States*, 284 U.S. 299 (1932), serves a generally similar function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction. In determining whether separate punishment might be imposed, *Blockburger* requires that courts examine the offenses to ascertain 'whether each provision requires proof of a fact which the other does not.' *Id.*, at 304. As *Blockburger* and other decisions applying its principle reveal . . . the Court's application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.

*Id.* at 337-38 (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)).

The McKenzie indictment charges Henry with conspiracy under both 18 U.S.C. § 371 and 18 U.S.C. § 1349. Section 371 contains an overt-act requirement, *Whitfield v. United States*, 543 U.S. 209, 214 (2005), but Section 1349 does not contain an overt-act requirement, *United States v. Ellis*, No. H-10-416-S, 2011 WL 3793679, *5 (S.D. Tex. Aug. 25, 2011). Furthermore, 18 U.S.C. § 1349 prohibits conspiring "to commit any offense under this chapter[,]" but Henry's 18 U.S.C. § 371 conviction was based on a conspiracy to violate a section of Title 42. We find that there was no multiplicity violation in this case.

Nos. 12-30807 & 12-30808

## II.    Chikenna's Appeals

On appeal, Chikenna contends that the district court violated her constitutional right to choose her retained counsel when it denied her motions for substitution of counsel.  Chikenna asserts that  since the Supreme Court's decision in *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), "this [c]ourt has not had occasion . . . to address the competing interest between the district court's calendar and the defendant's right to the counsel of his choice[.]" Appellant's Br. at 14.  She urges this court to follow the example of the Seventh Circuit in *United States v. Sellers*, 645 F.3d 830, 832-34 (7th Cir. 2011), where that court reversed a district which did not grant a continuance which would have enabled the defendant to be represented by substitute counsel.  The government argues that a defendant's choice of counsel is not absolute, and it must be balanced against other concerns.  The government asserts that the trial court did not abuse its discretion when it denied Chikenna's motions for substitution.  Before turning to the applicable law, we review the hearing that occurred in the district court.

## A.    Hearing in the District Court

On October 25, 2011, thirteen days before her trial was set to begin in the McKenzie case, Chikenna filed motions in both the McKenzie and Jones cases to substitute retained counsel, Stephen Spring ("Spring"), for her court-appointed counsel, Michael Fiser ("Fiser").  On October 27, 2011, the district court held a hearing regarding Chikenna's motions to substitute counsel.[9]

---

[9] Transcript of October 27, 2011 Hearing on Chikenna Jones's Motion to Substitute Counsel, United States v. Shedrick O. McKenzie, et al, No. 3:11-cr-9 (M.D. La. Oct. 4, 2012), ECF No. 287.

Nos. 12-30807 & 12-30808

At the hearing, the district court inquired into why Chikenna sought to substitute counsel. Chikenna responded that Fiser had not done anything and he "ha[d]n't talked to any witnesses, he ha[d]n't contacted anyone, as far as [she was] aware of. The only thing [he had] done that [she was] aware of is talk to the government." The district court then informed Chikenna that it could "disprove some of that because [Fiser] sat through a trial – in an earlier trial involving this matter, a good portion of it."

Further inquiry revealed that Chikenna had failed to even ask Mr. Fiser if he had interviewed witnesses. Although, Chikenna stated that Fiser had not asked her for names of potential witnesses.

For his part, Fiser testified that he had "been working on the case for about a year going through thousands and thousands of pages of discovery of witness statements[.]" Mr. Fiser further asserted that he had shared relevant information with Chikenna. Additionally, Mr. Fiser informed the court that he had asked Chikenna about witnesses, but she had identified witnesses that were parties to the case. Fiser explained that he had declined to talk to those witnesses directly because they were represented by counsel. He explained that he had "a pretty good feel for what everybody [was] going to say at trial."

The district court then addressed Chikenna and stated: "[Y]ou understand that this matter begins a week from this coming Monday?" When Chikenna responded affirmatively, the district court continued:

> And do you understand that in no way can a new counsel be brought up to speed to try this case in a week? Because I can tell you from, you know, having gone through a prior trial in this matter, I am familiar with the multitude of documents and things that are available and in having pre-trial hearings in this case, that for – it would take more than a week for a new counsel to begin to even look at the documents that apply to this case.

18

This trial is schedule for something like a week, so there are many witnesses – two weeks. There are many witnesses, there are many documents, and in no way could anyone be prepared to represent you adequately in that time. So that would mean that I would have to – if I allow a new counsel to enroll – to continue this trial and I'm not inclined to do that.

The district court then briefly reviewed the events of the previous eight months in the McKenzie case and asked why Chikenna had waited so long to request new counsel. Chikenna responded, that she had sought to have Spring become her co-counsel, she "believe[d], sometime in August, and nothing transpired with that as well."

The government asserted that due to Spring's prior involvement in the case, allowing him to represent Chikenna could create a conflict. The government further articulated several specific ways it would be prejudiced by a continuance.

Spring then testified that he had contacted Fiser in August about joining Chikenna's legal team and had followed up on that email on October 14, 2011. Spring stated that when Fiser responded, Fiser told Spring that the CJA rules would not allow him to enter the case in the manner Spring was attempting to enter the case. Spring also acknowledged that "it's a short notice and there are thousands of pages of discovery."

After hearing from another attorney from Spring's firm and counsel for Henry, the district court stated that it was evaluating the motion to substitute under *Gandy v. State of Alabama*, 569 F.2d 1318 (5th Cir. 1978). The district court explained that it was required to weigh and balance "the premise that a defendant is and should be allowed to have representation of counsel of her choice" with "an equally desirable public need for the efficient and effective

19

administration of criminal justice."   The district court explained the factors it had to weigh  were "the accused['s] rights, such as those relating to a speedy trial, to an adequate opportunity to prepare the defense, to confront and investigate the witnesses who may testify, and to the court's docket, the availability of prosecution witnesses . . . [and the] impact [on] other defendants . . . ."

The district court noted that due to the "vast amount of materials and witnesses" a continuance would be necessary if new counsel was allowed to enter the case.  The district court then stated  it had "not been shown any evidence that [Fiser] ha[d] not done what a competent and effective counsel would do." The district court observed that there appeared to be a disconnect between Fiser and Chikenna on what Fiser had done and that  her complaints were based on supposition not "anything of a factual nature."  The district court noted the government's statement regarding lengthy preparation for the trial, its own concern that a delay could compromise the availability of a key witness, and the fact that the court's schedule would require a continuance of several months. The district court then denied Chikenna's motions to substitute counsel.

## B.    Analysis

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."   U.S. CONST. amend. VI.   Included in that right is the "right of a defendant who does not require appointed counsel to choose who will represent him."  *Gonzalez-Lopez*, 548 U.S. at 144 (citation omitted).  There are limits on this right.  The Supreme Court cautioned:

Nothing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right to

> counsel of choice . . . . We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar. The court has, moreover, an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.

*Id.* at 151-52 (internal quotation marks and citations omitted). Therefore, the district court was required to balance Chikenna's right to counsel of choice against the needs of fairness and the demands of its calendar. Although the district court based its decision on a balancing test articulated by this court in *Gandy* instead of the balancing test articulated by the Supreme Court in *Gonzalez-Lopez*, as explained below, we are satisfied that the district court adequately addressed the *Gonzalez-Lopez* factors.

Chikenna and the government disagree on the standard of review that applies to her appeal of the district court's refusal to allow her to substitute counsel. Chikenna argues that a de novo standard applies, and cites *United States v. Simpson*. In *Simpson*, this court stated: "Although we review Sixth Amendment claims *de novo*, if that Amendment has not been violated, the trial court's refusal to appoint substitute counsel is reviewed for an abuse of discretion." 645 F.3d 300, 307 (5th Cir. 2011) (citation omitted). The government argues that an abuse of discretion standard applies, and cites several cases including *Gonzalez-Lopez*. As the government points out, the Supreme Court's reference to the "trial court's wide latitude" in *Gonzalez-Lopez* is incompatible with de novo review. We agree that the balancing test articulated in *Gonzalez-Lopez* is inconsistent with de novo review and will review the district court's decision to disallow the substitution of counsel for an abuse of discretion.

21

1.    **Counsel of Choice**

Regarding Chikenna's counsel of choice, it is clear that Chikenna wanted Spring to represent her.   The district court indicated that it started its analysis with a premise that Chikenna should be allowed to have the representation of her choice.  The district court inquired into her motivation behind this request, and she explained that she thought Fiser was not preparing for the case properly.  Although the district court did not share Chikenna's concerns about Fiser, the constitutional right to an attorney of one's choice does not require a defendant to make a well informed decision.  *Cf. Gonzalez-Lopez*, 548 U.S. at 148.   Chikenna wanted Spring to represent her, and that request should have been honored unless it was outweighed by the needs of fairness and the court's calendar.  Therefore, the inquiry into Chikenna's motivation for her request for a different attorney is more appropriately analyzed as part of the needs of fairness inquiry.

It is worth emphasizing, however, that the district court explicitly considered Chikenna's reason for wanting new counsel.  This distinguishes the present case from the situation considered by the Seventh Circuit in *United States v. Sellers*, upon which Chikenna relies.  In reversing the district court in *Sellers*, the Seventh Circuit noted the district court's failure to consider the defendant's rationale for wanting a different attorney.  645 F.3d at 838-39.

2.    **Fairness**

Turning to the needs of fairness, there are several reasons why the needs of fairness cut against allowing a substitution in this case.  First, the district court found that allowing Spring to substitute in as counsel would have required a continuance, and the government articulated specific ways it would be prejudiced by such a continuance.   This was a complicated case and the

government indicated that it had spent a significant amount of time and money preparing for the trial and that it would incur significant additional costs if the trial were continued.  Although Chikenna argued that she could be tried when the trial of another co-defendant whose trial had already been continued was held, the government asserted that that co-defendant was planning to plead guilty.  Thus, if Chikenna's trial had been continued it would have likely caused the government to incur significant additional costs.

Second, the district court asked Chikenna why she was dissatisfied with Fiser's representation and determined that her concerns about Fiser were suppositional and "not based on anything of a factual nature."  Chikenna does not challenge that assessment on appeal or argue that Fiser was unprepared to represent her.  Furthermore, when pressed at oral argument, Chikenna's counsel was unable to identify any unfairness Chikenna had suffered as a result of the denial of the substitution beyond being deprived of her choice of counsel.

Third, considering the protracted nature of the McKenzie case, Chikenna waited until late in the case to request the substitution.  The record indicates that Chikenna knew she wanted Spring to aid in her representation as early as August 2011, but she did not file her motions to substitute until October 25, 2011.  Because Chikenna has not directed us to evidence that she diligently pursued a substitution of counsel in that period, it is not unfair to hold the delay in seeking the substitution against her.

Fourth, the district court was concerned that a continuance could compromise the availability of a key witness, Dr. Francis, who had been in and out of the hospital.  Although Chikenna points out that the government did not call Dr. Francis at trial, she does not argue that anyone knew that Dr. Francis would not be called at the time the district court considered the motion to

substitute counsel.  The district court's concern for the availability of a key witness further suggests that its refusal to allow the substitution supported the needs of fairness.

After considering the circumstances surrounding Chikenna's motion to substitute, we find that the needs of fairness cut against allowing a substitution.

### 3.    The District Court's Calendar

At the substitution hearing, the district court explained that it was persuaded that a substitution of counsel would necessitate a continuance due to the vast quantity of material a new attorney would need to review. Furthermore, the Court explained that it would be several months before it could try the case if it were continued.

Chikenna does not deny that allowing Spring to substitute in as her counsel would have necessitated a continuance.  Instead, she criticizes the district court for failing to ask Spring how long it would take him to prepare for trial.  The government argues that such an inquiry was unnecessary given the district court's knowledge of the case.

Ideally, the district court would have asked Spring how much time he needed to prepare.  But on the facts of this case, such an inquiry was not necessary.  Here, the district court indicated that it was familiar with the amount of evidence involved and the district court was convinced that a substitution would necessitate a continuance.  The record indicates that the district court knew that to be meaningful, a continuance would need to be several days, and that initial delay would trigger a several month delay due to the district court's availability.

Chikenna points out that court schedules are constantly in flux and quotes the Seventh Circuit's opinion in *Sellers*, 645 F.3d at 838, for the

24

proposition that even a delay of "a month or so can easily be outweighed by an defendant's interest in having counsel of choice." But the anticipated several month delay in this case is distinguishable from the "month or so" delay contemplated in *Sellers*.

Chikenna also quotes *Sellers, id.*, for the proposition that "trial dates frequently open when cases settle and defendants plead" and points out that the district court's scheduled actually opened up in January. But, Chikenna does not argue that at the time the district court considered her motion to substitute, the district court already knew of specific dates it would be available which were not months away.

We will refrain from critiquing the needs of the district court's calendar with the benefit of hindsight. At the time the district court was evaluating the motions to substitute, it determined that the substitution would require a several month continuance. Thus, the demands of the court's calendar weighed heavily against granting the substitution.

### 4.    **Whether the District Court Abused its Discretion**

Chikenna had a constitutional interest in the counsel of her choice, which the district court was required to balance against the needs of fairness and its schedule. We agree with the district court that the balance of factors weighed against granting the substitution in this case. The district court did not abuse its discretion in denying the motions to substitute.

### CONCLUSION

After applying this circuit's five-factor double jeopardy test, we find that the conspiracy in the Ngari case was separate from the conspiracy in the McKenzie case. Therefore, the indictment in the McKenzie case did not create a double jeopardy violation. Additionally, there was no multiplicity violation.

Nos. 12-30807 & 12-30808

After balancing Chikenna's right to the counsel of her choice against the needs of fairness and the demands of the court's calendar, we find that the district court did not abuse its discretion in denying Chikenna's motions to substitute counsel.

AFFIRMED.