# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 28, 2014

Lyle W. Cayce
Clerk

No. 12-20741

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID A. MONTGOMERY; BRIDGET M. MONTGOMERY,

Defendants - Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before JONES, ELROD, and HAYNES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Following a jury trial, defendants David and Bridget Montgomery, husband and wife, were convicted of conspiracy to avoid federal income tax and of filing false tax returns. The Montgomerys argue on appeal that the district court incorrectly instructed the jury on the willfulness element of the charged tax offenses and incorrectly calculated the total tax loss resulting from the offenses. There being no reversible error, we AFFIRM.

I.

The Montgomerys owned and operated Montgomery's Contracting L.L.C., a sole proprietorship that earned revenue by building churches and performing construction work for small businesses and residential properties. They also formed a church called the Restoration Temple Church of God in

No. 12-20741

Christ ("Restoration Temple"), where Mr. Montgomery was the pastor.

On December 20, 2010, a grand jury returned an indictment charging the Montgomerys with one count of conspiracy to defraud the United States by impeding, impairing, and obstructing the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment, and collection of income taxes, in violation of 18 U.S.C. § 371 ("Count One"). The indictment also charged the Montgomerys with two counts of making and subscribing a false federal income tax return, for calendar years 2004 and 2005, in violation of 26 U.S.C. § 7206(1) ("Counts Two and Three"). The Montgomerys pleaded not guilty and the case proceeded to trial.

A three-day jury trial commenced on August 7, 2012.[1] At trial, the government offered evidence showing that the Montgomerys had underreported the gross receipts of Montgomery's Contracting on Schedule C of their joint federal income tax return by $1,066,012 for 2003, by $590,362 for 2004, and by $485,613 for 2005, or $2.1 million total.[2] The Montgomerys did not challenge these figures. Instead, the Montgomerys argued at trial that they had not *willfully* underreported the gross receipts of Montgomery's Contracting. That is, they argued that they did not know that their actions violated tax law.

The government attempted to show the jury that the Montgomerys, who operated a successful business for several years, were sophisticated taxpayers who knew how to manipulate their income in order to avoid paying taxes. The government offered evidence that the Montgomerys had concealed

---

[1] We view the evidence presented at trial "in the light most favorable to the jury's verdict," as we must. *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 504 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013).

[2] Schedule C is a federal income tax return form in which the owner of a sole proprietorship must report the business's gross receipts, deductible expenses, and the resulting net profit or loss for the tax year. The Montgomerys' underreported gross receipts were essentially checks from their construction business clients.

No. 12-20741

Montgomery's Contracting business receipts by depositing them in personal or Restoration Temple bank accounts and by transferring funds among their fourteen separate bank accounts. IRS Special Agent Robert Brown ("Agent Brown") testified that the Montgomerys gave inconsistent answers when questioned about their business income and expenses.

Other evidence indicated that the Montgomerys had reported different levels of income in other endeavors, such as in a loan application or in paperwork submitted to car dealerships for automobile purchases, to suit their needs. For example, Mrs. Montgomery reported $127,274 of business income in a 2003 tax return that she submitted in a loan application. The Montgomerys' actual tax return that they submitted to the IRS reflected $10,224 of business income. There were at least three other instances of similar behavior. The government also elicited testimony showing that between 2003 and 2006 the Montgomerys and their family members purchased and drove a number of cars, including a Lexus, Land Rover, Mercedes, Nissan, Jeep, BMW, Bentley, and two Infiniti models.

To show that the Montgomerys were well aware of their duty to report the income, the government relied in part on the testimony of Clara Carrington, an accountant who prepared the Montgomerys' tax returns from 1997 to 2000. Carrington testified that while there are complexities associated with tax returns, "income" is not one of them. Carrington further testified that she advised the Montgomerys that they were required by law to report all of the income and expenses associated with Montgomery's Construction. Carrington stopped preparing the Montgomerys' tax returns after 2000 because she felt uncomfortable with the lack of information supplied by the Montgomerys. Thereafter, the Montgomerys used Carrington's signature without her authorization when submitting their 2003 and 2004 tax returns to the IRS.

## No. 12-20741

In his defense, Mr. Montgomery testified that he did not willfully underreport the income from Montgomery's Contracting or otherwise submit false federal income tax returns.  Mr. Montgomery testified that he had donated between 80% and 90% of his earnings to Restoration Temple and that he believed that any money that he donated to Restoration Temple was exempt from federal income taxes.[3]  He also testified that he believed that Restoration Temple could provide funds to its pastor for his general expenses.

To define the element of willfulness, Mr. Montgomery's counsel proposed a jury instruction pursuant to *Cheek v. United States*, 498 U.S. 192 (1991), which provided in part:

> A defendant does not act willfully if he believes in good faith that his actions comply with the law.  Therefore, if the Defendant believed that what he was doing was in accord with the tax statutes, he cannot be said to have acted with criminal intent. Therefore, if you find that the Defendant honestly believed that he was not violating the tax laws, even if that belief was unreasonable or irrational, then you should find him not guilty. However, you may consider whether the Defendant's belief was actually reasonable as a factor in deciding whether he held that good faith belief.

The government submitted a substantially similar jury instruction pursuant to *Cheek*:

> A defendant does not act willfully if he believes in good faith that his actions comply with the law.  If you find that the defendant honestly believed that he was not violating the tax laws, even if that belief was unreasonable or irrational, then you should find the defendant not guilty.  However, you may consider whether the defendant's belief was reasonable and rational as a factor in

---

[3] At trial, Agent Brown testified that, even if the Montgomerys had donated 90% of their earnings from Montgomery's Contracting to Restoration Temple, they would have nevertheless been required to report those earnings on their federal income tax returns. The government further argued at trial that if the Montgomerys had put most of their money into Restoration Temple they would barely have enough money to pay the property taxes on their property and would not have enough money to live on.

determining whether the defendant actually held that belief in good faith.

Then, over the Montgomerys' objection, the district court instructed the jury, in pertinent part:

> The Montgomerys must be found to have acted knowingly and willfully. "Knowingly" means that an act was done voluntarily and not because of mistake or accident. "Willfully" means an act was done with a conscious purpose to violate the law. If you find that a defendant acted in good faith, you must acquit that defendant because his good faith is inconsistent with his having the intent to defraud or to violate the law.

> The Montgomerys, of course, do not have to prove their good faith, since they do not have to prove anything. If the government establishes beyond a reasonable doubt that a defendant acted with specific intent to defraud, then that defendant could not have had good faith. If a defendant believed, in good faith, that what he was doing followed the tax law, he would not have had criminal intent.

Thus, although the district court instructed the jury that it must acquit if the Montgomerys acted in good faith, it did not say that Montgomerys' beliefs could be "unreasonable or irrational," as both the government and Mr. Montgomerys' counsel requested. The district court reasoned that doing so was unnecessary under *Cheek* and Fifth Circuit precedent.

The jury returned a verdict of guilty on all counts as to each defendant. The Montgomerys then filed a joint motion for a new trial based on the district court's jury instruction. They argued, as they do now on appeal, that the jury instruction did not comport with *Cheek*. The district court denied the motion and the case proceeded to sentencing.

At a joint sentencing hearing, the Montgomerys objected to the tax loss calculation in the pre-sentence investigation report ("PSR"). The PSR stated that the total "tax loss," or the amount of the Montgomerys' unpaid taxes

resulting from their failure to report income, was $599,755.[4]  To arrive at that figure, the probation officer multiplied the underreported gross receipts from Montgomery's Contracting for each year by an estimated tax rate of 28%.  Although the Montgomerys accepted the underreported gross receipts figures themselves, they argued that they should have been offset by Montgomery's Contracting's cost of goods sold, including the cost of construction materials and labor, and that as a result the tax loss was significantly overstated.  Relying on a report prepared by Richard Jones, a certified public accountant (the "Jones Report"), the Montgomerys asserted that the true total tax loss suffered by the IRS was in fact either $137,990 or $68,995, taking into account the cost of goods sold and other deductions.  The government objected to the Montgomerys' tax loss calculation, contending that it was speculative and not based on any actual business records.  It therefore urged the district court to rely on the tax loss calculation contained in the PSR.

The district court agreed with the government and accepted the tax loss calculation contained in the PSR.  Accordingly, the district court sentenced each defendant to 41 months of imprisonment as to Count One and 36 months of imprisonment as to Counts Two and Three, each to run concurrently and followed by three years of supervised release.  The district court also ordered restitution to the IRS in the amount of $550,000.  The Montgomerys appealed.

## II.

The Montgomerys make two arguments on appeal.  They argue that the district court incorrectly instructed the jury on the willfulness element of the

---

[4] Based upon a $599,755 tax loss, the Montgomerys' base offense level was 20. Finding that the Montgomerys fell into criminal history category I, the PSR calculated that the range of imprisonment under the Sentencing Guidelines was 33 to 41 months.

charged tax offenses.  They also argue that the district court's tax loss calculation was significantly overstated and that as a result they received higher sentences under the Sentencing Guidelines.

## A.

We first address the Montgomerys' jury instruction argument.  We review a properly preserved challenge to a jury instruction for abuse of discretion and consider "whether the instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" *United States v. Aldawsari*, 740 F.3d 1015, 1019 (5th Cir. 2014) (quoting *United States v. Richardson,* 676 F.3d 491, 506 (5th Cir. 2012)).  But even if the jury instruction was erroneous, we will not reverse if, "in light of the entire record, the challenged instruction could not have affected the outcome of the case.'" *United States v. Demmitt*, 706 F.3d 665, 675 (5th Cir. 2013) (quoting *Baisden*, 693 F.3d at 504–05).  We conclude that the district court's jury instruction was erroneous; however, we nevertheless affirm because we are convinced that the error could not have affected the outcome of the case.

Although ignorance of the law or a mistake of law generally does not provide a defense to criminal prosecution, that is not so with regard to federal tax offenses.  *Cheek*, 498 U.S. at 199–200.  "[D]ue to the complexity of the tax laws," certain federal criminal tax offenses require, as an element of the offense, the establishment of a defendant's willfulness.  *Id.* at 200.  In *United States v. Pomponio*, 429 U.S. 10, 12 (1976), the Supreme Court defined willfulness in this context as "a voluntary, intentional violation of a known legal duty."

Fifteen years later, in *Cheek*, 498 U.S. at 201, the Court clarified *Pomponio*'s definition of willfulness.  There, the district court instructed the jury that an "honest but unreasonable belief is not a defense and does not

7

negate willfulness." *Id.* at 197. The Supreme Court held that the district court's instruction was incorrect. *Id.* at 202. It reasoned that the government cannot carry its burden to prove willfulness in a criminal tax prosecution if the jury believes that the defendant, in good faith, did not understand the law. *Id.* That is true regardless of "however unreasonable a court might deem such a belief." *Id.*; *see also United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005) ("[A] defendant's good-faith belief that he is acting within the law negates the willfulness element.").

Here, the Montgomerys argue that the district court's jury instruction did not comport with *Cheek* because it did not advise the jury that a defendant's good-faith misunderstanding of tax law may be objectively unreasonable. In response, the government argues that, despite the fact that its own proposed jury instruction included the unreasonableness language from *Cheek*, it was unnecessary in light of the Supreme Court's decision in *Pomponio*, 429 U.S. 10, and our own decision in *Simkanin*, 420 F.3d 397. They reason that, pursuant to those decisions, where a district court correctly instructs the jury as to willfulness an additional instruction on the good-faith defense is unnecessary. In any event, the government argues that the error was harmless due to the overwhelming evidence of the Montgomerys' guilt.

We agree with the Montgomerys that the jury instruction was erroneous. The import of *Cheek*, as applied to this case, is clear: if the Montgomerys truly believed that they were not obligated to report their income, then the jury could acquit, however objectively unreasonable the Montgomerys' belief was. Both parties agreed to instruct the jury along those lines by explaining that the Montgomerys' beliefs regarding tax law could be "unreasonable or irrational." Yet the jury instruction, given *sua sponte* by the district court, did not explain that point. Rather, it only included a portion of *Cheek*'s good-faith defense:

8

If you find that a defendant acted in good faith, you must acquit that defendant because his good faith is inconsistent with his having the intent to defraud or to violate the law. . . . If a defendant believed, in good faith, that what he was doing followed the tax law, he would not have had criminal intent.

To be sure, defendants are not entitled to their exact choice of verbiage in a jury instruction. *See United States v. Simmons*, 374 F.3d 313, 319 (5th Cir. 2004). They are, however, entitled to a jury instruction that "correctly reflect[s] the issues and the law." *See United States v. McKinney*, 53 F.3d 664, 676 (5th Cir. 1995). The instruction here did not meet that standard—the jury was left to decide the case bereft of a legal rule announced by the Supreme Court in a case that altered the landscape of federal tax prosecutions.

Moreover, by including but failing to explain the full breadth of *Cheek*'s good-faith defense, the district court's jury instruction risked implying—in direct conflict with *Cheek*—that the Montgomerys could not be acquitted on the basis of good faith unless their views were objectively reasonable. *See United States v. Morris*, 20 F.3d 1111, 1118 (11th Cir. 1994) (holding that a jury instruction compromised the appellants' good-faith argument because it did not "make clear that a good-faith belief by the appellants that they were complying with the tax laws, whether or not objectively reasonable, negates the specific intent element"). That is because good faith is often equated with reasonableness. *See, e.g., Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (explaining that the Supreme Court has referred to actions taken in an "objectively reasonable manner" as "objective good faith"); *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012), *cert. denied*, 134 S. Ct. 162 (2013) ("Because the officers' use of force was not objectively reasonable, it was not in good faith . . . ."); *Mathis v. Exxon Corp.*, 302 F.3d 448, 455 (5th Cir. 2002) ("Good faith includes observance of reasonable commercial standards of fair

dealing . . . ." (quoting Tex. Bus. & Com. Code § 2.305 cmt. 3)); Black's Law Dictionary (9th ed. 2009) (explaining that the phrase "good faith" excludes conduct that contravenes "community standards of decency, fairness or *reasonableness*" (emphasis added)).  Like the jury instruction in *Morris*, 20 F.3d at 1118, the district court's instruction here did not clarify that the Montgomerys' good-faith belief need not be objectively reasonable.

Indeed, for this reason, the cases cited by the government are factually distinct.  In both *Pomponio*, 429 U.S. at 12, and *Simkanin*, 420 F.3d at 410, the issue was whether the district court should have instructed the jury on the good-faith defense in order to adequately explain the definition of willfulness, not the content of the good-faith defense itself, which is at issue here.  When good faith *is* mentioned in a *Cheek* jury instruction, our sister circuits routinely explain that a defendant's good-faith belief need not be objectively reasonable.  *See, e.g.*, *United States v. Mostler*, 411 F. App'x 521, 523 (3d Cir. 2011) (unpublished); *United States v. Boyd*, 378 F. App'x 841, 849–50 (10th Cir. 2010) (unpublished); *United States v. Dean*, 487 F.3d 840, 850 (11th Cir. 2007); *United States v. Hilgeford*, 7 F.3d 1340, 1343 (7th Cir. 1993); *see also* Seventh Circuit Pattern Criminal Jury Instructions § 6:11; Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.25; Third Circuit Model Criminal Jury Instructions § 6.26.7401-4 cmt.; Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit § 9.42.  *But see Morris*, 20 F.3d at 1118.

Nevertheless, the erroneous jury instruction in this case was harmless because the evidence showing that the Montgomerys intentionally underreported their income was "so overwhelming that the error could not have contributed to the jury's decision to convict."  *See Healy v. Maggio*, 706 F.2d 698, 701 (5th Cir. 1983).  Over the course of three years, the Montgomerys underreported over $2.1 million of gross receipts from their

business.  Although they asserted at trial that they did not willfully do so, they repeatedly reported less income—never more income—to the IRS than they reported to other entities.  Indeed, the Montgomerys did so using the same tax forms, only with different numbers.

Moreover, the Montgomerys' accountant, Carrington, advised them that they were required by law to report all of the income and expenses from Montgomery's Contracting.  Then, after Carrington told the Montgomerys she could no longer prepare their tax returns because they did not provide her with sufficient information, they continued to apply her name their tax returns without her authorization.  They frequently transferred funds among their numerous bank accounts, making it difficult to track their expenses, and they gave inconsistent answers to Agent Brown when questioned about their business's income and expenses.

Finally, the Montgomerys have not shown that the district court's jury instruction prevented them in any way from presenting the full breadth of their good-faith defense to the jury.  In fact, the Montgomerys' good-faith defense was central to defense counsel's closing argument.[5]    Thus, considering the entire record, we are convinced that the erroneous jury instruction had no bearing on the jury's decision.  *See Demmitt*, 706 F.3d at 675.

## B.

We now turn to the Montgomerys' contention that the district court erred by adopting the PSR, which contained a purportedly incorrect calculation of the tax loss attributable to their actions, and that as a result

---

[5] In closing argument, defense counsel argued that the prosecution had the burden to prove that Mr. Montgomery did not act in good faith; that he relied on advice given to him that the money he gave to the church was not taxable; that Mrs. Montgomery was unsophisticated with regard to preparing tax returns; and that she did not intent to cheat the government.

they received higher sentences under the Sentencing Guidelines.  We review a district court's interpretation or application of the Sentencing Guidelines *de novo* and its factual findings for clear error.  *See United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008); *see also United States v. Phelps*, 478 F.3d 680, 681 (5th Cir. 2007).  "There is no clear error if the district court's [factual] finding is plausible in light of the record as a whole." *Cisneros–Gutierrez*, 517 F.3d at 764 (internal quotation marks omitted).

The Sentencing Guidelines provide that where, as here, a defendant's offense involves the filing of a fraudulent or false tax return, "the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)."  U.S.S.G. § 2T1.1(c).  "If the offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income . . . unless a more accurate determination of the tax loss can be made."  U.S.S.G. § 2T1.1(c) cmt. n.(A).

IRS Agent Brown testified at trial that the PSR reflected the correct tax loss amount, $599,755.  To arrive at that figure, Agent Brown multiplied the underreported gross receipts from Montgomery's Contracting for each year by a tax rate of 28%.  Agent Brown did not offset the underreported gross receipts by any additional expenses, such as Montgomery's Contracting's cost of construction materials and labor, that were not already disclosed in the Montgomerys' tax returns.[6]  He did not do so for three reasons:  (1) the Montgomerys failed to provide him with their books and

---

[6] In the Schedule C accompanying each of the Montgomerys' federal income tax returns, the Montgomerys reported business expenses of $371,064 in 2003, $134,677 in 2004, and $28,466 in 2005.  Agent Brown did not challenge these figures, despite the Montgomerys' failure to provide him with their books and records.

records despite multiple requests;[7] (2) the Montgomerys commingled and transferred funds among their various bank accounts; and (3) the Montgomerys had maintained in their interviews with him that they had reported all of their expenses in their federal income tax returns.

As they did before the district court, the Montgomerys argue on appeal that the district court could have calculated a more accurate tax loss amount. *See* U.S.S.G. § 2T1.1(c) cmt. n.(A). They reason that the tax loss reflected in the PSR bore no resemblance to the actual tax loss because it did not take into account the business expenses—the cost of the bricks, mortar, labor, etc.—associated with Montgomery's Contracting's underreported gross receipts.

To substantiate their argument, the Montgomerys rely exclusively on the Jones Report. The Jones Report estimated the costs and expenses that Montgomery's Contracting, or any other construction company, would incur in order to generate the gross receipts that the Montgomerys did not report as income. It relied on Jones's industry experience and statistics obtained from BizStats, an online provider of business statistics. Applying these figures, the Jones Report estimated that Montgomery's Contracting's income, after accounting for all of its expenses, should approximate 19.29% of gross receipts. As a result, the Jones Report concluded that the actual tax loss due to the Montgomerys' failure to report income was either $137,990 or $68,995.[8]

---

[7] Agent Brown testified that the Montgomerys told him that their books and records had been destroyed during a hurricane. Defense counsel for Mr. Montgomery acknowledged to the district court at sentencing that he did not have the Montgomerys' books and records either.

[8] The $137,990 figure factored in solely Montgomery's Contracting's cost of goods sold. The $68,995 figure factored in both the cost of goods sold and the Montgomerys' purportedly deductible charitable contributions. At sentencing, Mr. Montgomery's counsel conceded that accounting for the contributions was "problematic" and therefore focused the

No. 12-20741

The Montgomerys' tax loss argument is unavailing.  Although the Second and Tenth Circuits permit a sentencing court to consider, when calculating tax loss, unclaimed deductions that a defendant could have legitimately claimed, we—and several other circuits—do not.[9]  In *Phelps*, we held that the defendant was not entitled to reduce his tax loss by taking a tax credit that he did not claim on his fraudulent tax return.  478 F.3d at 682.  We reasoned that "tax loss" is the loss the defendant intends when he files the fraudulent tax return, not the government's actual loss.  *Id.*  "[R]eference to other unrelated mistakes on the return such as unclaimed deductions tells us nothing about the amount of loss to the government that his scheme intended to create."  *Id.* (quoting *Chavin,* 316 F.3d at 678) (internal quotation marks omitted).  Thus, under *Phelps*, the Montgomerys may not rely on their asserted, yet unclaimed, business expenses from Montgomery's Contracting to reduce the appropriate tax loss in this case.

In seeking to rebut *Phelps*, the Montgomerys cite the Tenth Circuit's

---

district court's attention on the $137,990 figure.  Because the Montgomerys failed to brief whether the district court should have accounted for any deductible charitable contributions that the Montgomerys could have claimed, they have waived this issue.  *See Rodriguez v. ConAgra Grocery Prods. Co.,* 436 F.3d 468, 474 n.21 (5th Cir. 2006) (holding that party waived argument by failing to brief it on appeal).

[9] *Compare United States v. Hoskins,* 654 F.3d 1086, 1094 (10th Cir. 2011); *United States v. Gordon,* 291 F.3d 181, 187 (2d Cir. 2002) *with United States v. Yip,* 592 F.3d 1035, 1041 (9th Cir. 2010); *United States v. Clarke,* 562 F.3d 1158, 1164–65 (11th Cir. 2009); *United States v. Delfino,* 510 F.3d 468, 473 (4th Cir. 2007); *United States v. Chavin,* 316 F.3d 666, 678 (7th Cir. 2002).  Sentencing Guideline Amendment 774, which was not effective until after the Montgomerys' sentencing, resolves this circuit split.  It explains that a sentencing court may consider unclaimed deductions to arrive at a reasonable estimate of tax loss.  Counsel for the Montgomerys conceded at oral argument that Amendment 774 is a substantive, rather than clarifying, amendment and is therefore not retroactively applicable to the Montgomerys.  *See United States v. Solis,* 675 F.3d 795, 797–98 (5th Cir. 2012) ("A statement that an amendment addresses a circuit conflict indicates that it is substantive.").  In any event, Amendment 774 still requires the deduction to be "reasonably and practicably ascertainable" and supported by sufficient information to determine its reliability.  The Montgomerys have not met that burden here, as explained below.

decision in *Hoskins*, 654 F.3d 1086.  Putting aside the fact that it conflicts with *Phelps*, our binding precedent, the court in *Hoskins* merely held that "the plain language of § 2T1.1 does not *categorically* prevent a court from considering unclaimed deductions in its sentencing analysis." *Id.* at 1094 (emphasis added).  Where the defendant "offers weak support for a tax-loss estimate," the sentencing court is not required speculate as to what deductions the defendant may have claimed.  *See id.*  Likewise here, the Montgomerys offer little and unreliable support for their proposed tax-loss estimate, as we explain next.

Even assuming *arguendo* that *Phelps* does not categorically prevent us from considering the Montgomerys' unclaimed business expenses, the district court "had many reasons to be skeptical of [the] proposed deductions." *See id.* at 1097.  To begin with, the Montgomerys repeatedly told Agent Brown that they had reported all of their business expenses, in direct conflict with what they now assert.  Moreover, the figures contained in the Jones Report did not rely on the Montgomerys' business records,[10] and Jones did not review these figures with the Montgomerys to ensure their accuracy.  *See United States v. Kellar*, 394 F. App'x 158, 169–70 (5th Cir. 2010) (unpublished but persuasive) (affirming the district court's decision to disallow the defendants' tax loss calculation because, among other reasons, their "accountant never reviewed his tax computations with the [the defendants] themselves to ensure their accuracy.").  Rather, the Jones Report relied on statistics obtained from BizStats, which disclaims any representation as to the accuracy of its statistics.  Of course, as the Montgomerys argue, most businesses do not obtain their materials and labor for free.  But the Jones Report failed to

---

[10] Indeed, at sentencing the district court explained that "[b]ecause the Montgomerys . . . did not keep accurate records, did not make accurate returns . . . it is impossible to know with any precision" their income or potential deductions or expenses.

account for the fact that certain subcontractors for Montgomery's Contracting were not paid for the work they performed, which Mr. Montgomery's counsel conceded at sentencing.

In sum, the Jones Report figures were of doubtful reliability and the district court did not err in declining to accept the Montgomerys' calculation as "a more accurate determination of the tax loss." *See* U.S.S.G. § 2T1.1(c) cmt. n.(A).

For the foregoing reasons, we AFFIRM.

No. 12-20741

HAYNES, Circuit Judge, concurring in the judgment:

Undoubtedly, the better part of valor for a district court faced with proposed jury instructions that are not inaccurate and that are requested by both sides is to give those instructions. But the failure to do so is not automatically an abuse of discretion. The district court was entitled to "broad discretion in framing the instructions to the jury," *United States v. McKinney*, 53 F.3d 664, 676 (5th Cir. 1995), and we are not supposed to conclude that the district court has abused that discretion unless the instructions, as a whole, create "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations," *United States v. Demmitt*, 706 F.3d 665, 675 (5th Cir. 2013). Because I conclude this high hurdle has not been jumped by the Montgomerys, I cannot join in the entirety of the majority opinion.

The majority opinion concludes that the district court erred because it did not advise the jury that a defendant's good-faith misunderstanding of tax law may be objectively unreasonable. *See Cheek v. United States*, 498 U.S. 192, 202 (1991). *Cheek*, however, did not mandate any particular language for conveying the general concept of good faith to the jury, and the district court did so convey that here, instructing the jury that it must acquit a defendant who believed in good faith that he was acting lawfully. The instructions stated: "If you find that a defendant acted in good faith, you must acquit that defendant because his good faith is inconsistent with his having the intent to defraud or to violate the law." The instructions therefore

17

No. 12-20741

generally address any good-faith belief, even an unreasonable one, held by a defendant and, taken as a whole, do not misstate the issues or the law. *See McKinney*, 53 F.3d at 676.

Moreover, we have previously held that a district court is not even required to include a specific instruction on good faith, where, as here, "it adequately instructed the jury on the meaning of willfulness." *United States v. Simkanin*, 420 F.3d 397, 411 (5th Cir. 2005); *see also United States v. Pomponio*, 429 U.S. 10, 13 (1976). Under *Simkanin*, the district court could therefore have declined to instruct the jury on a defendant's good-faith belief altogether and that decision would have been within its discretion. 420 F.3d at 411. I fail then to see how the district court's decision to instruct the jury on a defendant's good-faith belief generally, but not expressly address the "unreasonable" good-faith belief, could constitute an abuse of discretion.

Relying in part on *United States v. Morris*, 20 F.3d 1111, 1118 (11th Cir. 1994), the majority opinion concludes that the district court's jury instructions "risked implying that the Montgomerys could not be acquitted on the basis of good faith unless their views were objectively reasonable." However, *Morris* simply addressed the same circumstances as those presented in *Simkanin*, where a district court instructed a jury on willfulness but not on good faith. *Id.* at 1117. Although the Eleventh Circuit in *Morris* held that the district court's instructions were inadequate because they did not "make clear that a good-faith belief . . . negates the specific intent element of the crime," *id.* at 1118, we are bound by our holding in *Simkanin*, 420 F.3d at 411.

18

No. 12-20741

Moreover, the Eleventh Circuit in *Morris* acknowledged that "there is no requirement in this circuit that jury instructions specifically note that a good-faith defense need not be objectively reasonable." 20 F.3d at 1118. Yet, that is precisely what the majority opinion concludes is required here. The majority opinion's speculation on what the jury might have thought "good faith" means has no anchor in any relevant case law or the record here.[1] Whatever the "risks," our task is to determine whether the district court's jury instructions, taken as a whole, incorrectly reflected the issues and the law. *See McKinney*, 53 F.3d at 676. They did not. Given that our review is for abuse of discretion, I cannot conclude that the district court's jury instructions constituted such an abuse. *See United States v. Roussel*, 705 F.3d 184, 190 (5th Cir. 2013).[2]

---

[1] The cases cited by the majority opinion for the proposition that "good faith is equated with reasonableness" are neither tax cases nor jury instruction cases. They also do not support the conclusion that *this jury* might be confused about what "good faith" encompasses here. It is unlikely that a jury is regularly perusing Black's Law Dictionary or cases analyzing unrelated federal and Texas statutes, the only references cited by the majority opinion for this point.

[2] I agree with the majority opinion that if there is any error, it is harmless considering the evidence in this case.