# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-20247

United States Court of Appeals
Fifth Circuit

**FILED**

February 25, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

YOLANDA NOWLIN,

Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:12-CR-730

Before DAVIS, BARKSDALE and DENNIS, Circuit Judges.

PER CURIAM:*

Yolanda Nowlin, the owner and operator of a durable medical equipment supply business, was convicted by a jury of conspiracy to commit health care fraud, four substantive counts of committing health care fraud, conspiracy to violate the Anti-Kickback Statute, and social security fraud. The district court sentenced her to 132 months of imprisonment. On appeal, Nowlin challenges her convictions as well as her sentence. Finding no error, we affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-20247

**I.**

A grand jury returned an indictment that charged Nowlin with one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (count one); four substantive counts of committing health care fraud in violation of 18 U.S.C. § 1347 and § 2 (counts two through five); one count of conspiracy to violate the Anti-Kickback Statute in violation of 18 U.S.C. § 371 (count six); and one count of social security fraud in violation of 18 U.S.C. § 641 and § 2 (count seven). The indictment alleged that Nowlin formed, owned, and controlled Yellabone Medic Care Express Equipment Supply Company and Yellabone Medical Equipment, Inc. (collectively, "Yellabone"), a durable medical equipment ("DME") company located in Bryan, Texas. Nowlin submitted enrollment applications to Medicare and Medicaid (collectively "the programs") in Yellabone's name for the submission of claims for payment for DME supplied to Medicare/Medicaid beneficiaries by Yellabone. Nowlin hired Carla Parnell to help manage the day-to-day operations of Yellabone.

According to the indictment, Nowlin, with the help of Parnell, used Yellabone as an artifice to submit false claims to Medicare and Medicaid, which resulted in Yellabone receiving reimbursements from the programs for medical supplies that were never delivered to beneficiaries, or that, alternatively, were not wanted nor needed by the beneficiaries. For example, the indictment alleged that Nowlin submitted claims for ostomy supplies (which are used by patients to discharge bodily waste) that were neither needed nor requested by beneficiaries, and that Nowlin also submitted claims for motorized wheelchairs when, in actuality, a less expensive scooter was actually provided to the beneficiaries. The indictment further alleged that Nowlin conspired to pay

2

No. 14-20247

illegal "kickbacks" to individuals in exchange for the referral of Medicare and Medicaid beneficiaries to Yellabone.

Following a seven-day trial, a jury convicted Nowlin on all seven counts. The district court sentenced her to 120 months of imprisonment on count one to run consecutively with concurrent 12-month terms of imprisonment on each of counts two through seven, resulting in a total of 132 months of imprisonment. The district court also imposed a three-year term of supervised release on each of the seven counts to run concurrently with each other, restitution of $850,597.10, and a special assessment of $700. Nowlin appealed.

## II.

Nowlin first contends that the evidence at trial was insufficient to convict her of conspiracy to commit health care fraud (count one), the four substantive counts of health care fraud (counts two through five), and conspiracy to violate the Anti-Kickback Statute (count six).[1] Nowlin preserved her sufficiency challenge by filing a motion for judgment of acquittal under Fed. R. Crim. P. 29 at the close of the Government's case and at the close of all the evidence. Accordingly, we review *de novo* the denial of her Rule 29 motion. *See United States v. Daniels*, 723 F.3d 562, 569 (5th Cir. 2013). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "All reasonable inferences from the evidence must be construed in favor of the jury verdict." *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005) (internal quotation marks and citation omitted). "The jury

---

[1] As she conceded at oral argument, Nowlin does not challenge the evidence supporting her conviction for social security fraud in violation of 18 U.S.C. § 641 and § 2.

3

retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (internal quotations marks and citation omitted). In order to be sufficient, "'[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.* (internal quotation marks and citation omitted). As explained below, we conclude that there was ample evidence presented at trial to sustain Nowlin's convictions.

## A. The Health Care Fraud Offenses (Counts One through Five)

Count one of the indictment charged Nowlin with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, by conspiring to submit claims for payment for DME and supplies to Medicare and Medicaid that were not delivered to beneficiaries, were medically unnecessary, or were the result of "upcoding."[2] Counts two through five of the indictment charged Nowlin with substantive health care fraud under 18 U.S.C. § 1347 and aiding and abetting in the offense under 18 U.S.C. § 2.

"To prove a conspiracy to commit health care fraud, the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health care fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) [ ] the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *Grant*, 683 F.3d at 643 (citing 18 U.S.C. §§ 1347, 1349; *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012)). "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *Delgado*, 668 F.3d at

---

[2] "Upcoding" refers to the practice of filing claims with Medicare and Medicaid for more expensive items than were actually supplied to beneficiaries—*e.g.*, filing a claim for the payment of a motorized wheelchair when a less expensive scooter was actually provided.

226 (internal quotation marks and citation omitted). "However, there is insufficient evidence of a conspiracy if the Government has only piled inference upon inference upon which to base a conspiracy charge." *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014) (internal quotation marks and citation omitted).

To prove the four substantive counts of health care fraud in violation of 18 U.S.C. § 1347, the Government was required to "prove beyond a reasonable doubt that [Nowlin] knowingly and willfully executed, or attempted to execute, a scheme or artifice [ ] (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (alternations and internal quotation marks omitted).

"To obtain a conviction for aiding and abetting under 18 U.S.C. § 2, the Government must prove that [Nowlin] associated with the criminal venture [of health care fraud], purposefully participated in [that] criminal activity, and sought by [her] actions to make the venture successful." *Akpan*, 407 F.3d at 370-71. "A defendant associates with a criminal venture when [she] shares in the criminal intent of the principal." *Id.* "Participation means that the defendant engaged in some affirmative conduct designed to aid the venture." *United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir. 2005) (internal quotation marks and citation omitted).

The sole focus of Nowlin's argument as to counts one through five is that there was insufficient evidence adduced at trial that she had the requisite knowledge of or specific intent to commit the charged offenses. In particular, she argues that the jury placed undue weight on the testimony of Carla

No. 14-20247

Parnell, who had entered into a plea agreement with the Government prior to testifying. For the reasons explained below, we find Nowlin's argument unpersuasive.

Ample evidence was presented at trial showing that Nowlin had the requisite knowledge and intent to conspire to commit, to commit, and to aid and abet the commission of health care fraud. As an initial matter, the evidence shows that Nowlin was aware of her obligations to truthfully comply with Medicare and Medicaid regulations. In 2003, for example, Nowlin signed the Medicaid and Medicare enrollment applications as the sole owner, administrator, and delegated official for Yellabone. In doing so, Nowlin certified numerous times that she understood and agreed to comply with underlying regulations, which include, *inter alia*, only submitting claims for equipment that has been prescribed by a doctor, providing equipment or services *prior* to billing the programs, using correct procedure codes, and delivering only new equipment to beneficiaries. In addition, other evidence presented at trial sheds further light on the extent of Nowlin's knowledge of relevant program regulations and her obligation to comply with them. For instance, U.S. Department of Health and Human Services Special Agent Latisha Cleveland testified at trial regarding an interview that she conducted with Nowlin in 2004. During that interview, Nowlin explained that she understood the differences in billing for a motorized wheelchair and a power scooter and how those different pieces of equipment have their own distinct codes for filing claims with the programs.

Further, substantial evidence at trial showed that Nowlin knew and intended for Yellabone to disregard its obligations to comply with program regulations, thereby resulting in Yellabone being reimbursed by the programs for medical equipment that was not delivered, was not new, or was not

medically necessary as charged in the indictment. For example, the Government's first witness was Eleanor Brown, who was referred to Yellabone to obtain DME for her daughter, Jisha, who suffered from cerebral palsy and was a Medicaid beneficiary. Brown first went to Yellabone in 2004 in order to obtain a new specialized wheelchair for Jisha. Due to Jisha's medical condition, the wheelchair needed to have a headrest and straps to hold her in place. Nevertheless, the wheelchair ultimately provided by Yellabone lacked these necessary components. After Brown complained to Nowlin about the substandard wheelchair, Nowlin visited the Brown's home and observed Jisha's condition and the wheelchair. However, Nowlin never visited the Brown's home again or returned Brown's calls. Jisha was not eligible to receive another chair from Medicaid for five years and was required to use a "bath chair" with wheels on it instead. Later on, Brown attempted to obtain a hospital bed, but Medicaid denied the claim because its records indicated that Yellabone had previously delivered a bed to the Browns. Yet, Brown testified that she had never requested that Yellabone obtain a hospital bed and that she had never received one from Yellabone. Although Jisha never received a specialized wheelchair or a hospital bed from Yellabone, billing documents and Yellabone bank statements presented at trial confirmed that Medicaid reimbursed Yellabone for a specialized wheelchair and for a hospital bed for Jisha into a Yellabone bank account that Nowlin exclusively controlled and from which she regularly withdrew cash.

The testimony of numerous other program beneficiaries who dealt with Yellabone further supports a finding that Nowlin had knowledge of and specifically intended to commit health care fraud. For example, in May 2006, Linda Chopp, a Medicaid beneficiary, brought Nowlin a prescription for a scooter that she received from her doctor. The scooter that Yellabone

ultimately delivered to Chopp was used, never worked correctly, and ultimately caused a fire in Chopp's apartment. Nevertheless, Yellabone billed and received payment from Medicaid for a more expensive power wheelchair— not a scooter. Billing statements showed that Medicaid paid Yellabone over $3500 for a power wheelchair, instead of a cheaper scooter, for Chopp in May 2006. A bank statement submitted by the Government into evidence confirmed that Medicaid paid those funds to a Yellabone bank account that was controlled by Nowlin and from which she regularly made ATM withdrawals.

Similar to Chopp, Robert Brown also received a scooter from Yellabone through his program benefits. However, within three years of receiving this scooter, Brown explained that he required a power wheelchair as a result of a deterioration in his medical condition. Medicaid denied this request because Yellabone had previously filed a claim for a power wheelchair instead of the scooter that Brown had actually received. Medicare and Medicaid each reimbursed Yellabone for the payment of a power wheel chair and deposited those payments into a Yellabone bank account controlled by Nowlin. Brown's doctor, Dr. Wade Farrow, also testified at trial. Dr. Farrow confirmed that he previously had prescribed Brown a scooter. At trial, Dr. Farrow examined a prescription in Brown's file at Yellabone that had been altered with white-out and changed to request a power wheelchair.

Ada Taylor also testified at trial regarding her dealings with Yellabone. Taylor testified that Yellabone provided her with one box of adult diapers and one box of pull-ups for her disabled granddaughter, Chanel Wright. Taylor never received any other supplies from Yellabone. Yet, billing data introduced

at trial showed that Yellabone billed Medicaid for large amounts of incontinence supplies that neither Taylor nor Wright ever received.

The testimony of these beneficiaries was further corroborated by Yellabone employee Carla Parnell, who testified in detail that Nowlin provided her with a list of incorrect billing codes (which resulted in the submission of "upcoded" claims), instructed her to falsify delivery documents, and to bill for supplies that Yellabone never provided to beneficiaries.  According to Parnell, "whether [the beneficiaries] got their equipment or not," Nowlin "told [her] to bill it" to the programs.  The jury was free to credit Parnell's testimony notwithstanding the fact that she had entered into a plea agreement with the Government.  *See United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014) (observing that "a conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face." (internal quotation marks and citation omitted)).

In sum, the Government presented overwhelming evidence at trial that Nowlin had the requisite knowledge and intent to commit the crimes charged in counts one through five.  *See Willett*, 751 F.3d at 339-43; *Grant*, 683 F.3d at 642-44.

**B. Conspiracy to Violate the Anti-Kickback Statute (Count Six)**

Nowlin also argues that there was insufficient evidence presented at trial that she conspired to violate the Anti-Kickback Statute in violation of 18 U.S.C. § 371.  "A conviction of conspiracy under Section 371 requires the Government to prove: (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the

conspiracy." *United States v. Njoku*, 737 F.3d 55, 63-64 (5th Cir. 2013). Here, the relevant statute tied to the conspiracy charge is the Anti-Kickback Statute, which provides: "[W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony." 42 U.S.C. § 1320a-7b(b)(2)(A). Nowlin likewise argues that there was insufficient evidence to establish that she had the requisite knowledge or intent to commit the offense.

Contrary to Nowlin's contention, the evidence adduced at trial overwhelmingly supported a finding that she knowingly and willfully conspired to violate the Anti-Kickback Statute. Testimony at trial made clear that Medicare and Medicaid regulations proscribe the payment of commissions for beneficiary referrals, and Nowlin personally signed the Yellabone enrollment applications agreeing to comply with all relevant regulations. Nevertheless, the evidence showed that Nowlin entered into an agreement with various individuals whereby Yellabone would make "commission" payments in exchange for their referring clients to Yellabone. For example, Victoria Johnson testified that she solicited beneficiaries for Yellabone— sometimes by herself and other times with Nowlin. At trial, Johnson identified one of her commission files from Yellabone. She explained that she was paid her commissions on a monthly basis. Between 2003 and 2009, she received approximately four to six thousand dollars in checks from Yellabone and approximately five to seven thousand dollars in cash as commissions for referring Medicare/Medicaid beneficiaries to Yellabone. These payments

occurred either at Nowlin's home or at Yellabone's office.  Although Johnson briefly worked at Yellabone as an employee in 2003, she later quit this job and thereafter only worked "in the field" soliciting beneficiaries for Yellabone. Yellabone did not withhold taxes from her commission checks, nor did she ever keep an office at Yellabone or sign a sales contract.  Similarly, the evidence at trial showed that Yellabone also paid commissions to Frank Bosquez, a life insurance salesman, based upon the number of clients he referred to the company.  The trial testimony of Turner, Benford, Parnell, and Johnson corroborated that Bosquez received commissions for referrals and did not work in the office.  At trial, Parnell also identified the referral commission file for Bosquez.  In light of this evidence, we conclude that there was sufficient evidence that Nowlin knowingly and willfully conspired to violate the Anti-Kickback Statute.

### III.

Nowlin also argues that the district court erred in refusing to provide a "safe-harbor" jury instruction in relation to the count for conspiracy to violate the Anti-Kickback Statute.  This argument is likewise without merit.

As explained above, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare or Medicaid provider such as Yellabone. *See United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013).  However, the statute contains a "safe-harbor provision," under which "the statute's criminal prohibition does not apply to 'any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services.'"  *Id.* (quoting § 1320a-7b(b)(3)(B)).  As we explained in *Robinson*, relevant factors in determining whether an individual qualifies as

11

an "employee" under the safe-harbor provision include "the method of payment, whether the work is part of the regular business of the hiring party, and the hiring party's control over work hours." 505 F. App'x at 387 (internal quotation marks and citation omitted).

Nowlin's proposed jury instructions included a "safe-harbor" instruction. However, at the jury charge conference, both the Government and Nowlin's counsel agreed that no evidence showed that either Johnson or Bosquez had signed blank employment agreements found in Yellabone files. In addition, the district court agreed with the Government that there was no evidence Yellabone had ever withheld income taxes from Johnson or Bosquez's commission payments. The district court thus denied Nowlin's request for a safe-harbor instruction. In so doing, the district court emphasized, *inter alia*, that Johnson and Bosquez "had discretion over when and how long to work," their payment was on "a commission basis," their work was certainly not regular, the work was not subject to any employment agreement, "there were no benefits provided, and they were not treated as employees for federal income tax purposes."

In her briefing on appeal, Nowlin confusingly contends that the district court should have *sua sponte* provided a safe-harbor instruction because *Parnell*—as opposed to either Johnson or Bosquez—was a bona fide employee of Yellabone. Because Nowlin never argued before the district court that the safe-harbor instruction should be provided in light of Parnell's status as a bona fide employee, our review is for plain error. *See United States v. Job*, 387 F. App'x 445, 454 (5th Cir. 2010) (observing that "plain error" review applied to defendant's argument that "the district court erred by failing *sua sponte* to give

12

a jury instruction on Medicare's safe-harbor provision," because the claim was raised for the first time on appeal).

The indictment did not allege that Parnell herself was the recipient of illegal kickbacks. To the contrary, the indictment focused exclusively on the illegal payments made to Johnson and Bosquez in furtherance of the conspiracy between Nowlin and Parnell. Thus, because the indictment did not allege that Parnell was the recipient of any illegal remuneration, no plain error exists in the district court's failure to *sua sponte* provide a safe-harbor instruction in light of Parnell's employment status. *See id.* at 455-56.[3]

## IV.

Nowlin also argues that the district court erred in denying her motion to dismiss the indictment on the ground of multiplicity. She contends that count one, which charged conspiracy to commit health care fraud, and count six, which charged conspiracy to violate the Anti-Kickback Statute, are multiplicitous. We review Nowlin's argument *de novo. See United States v. Jones*, 733 F.3d 574, 584 (5th Cir. 2013).

"Multiplicity is the charging of a single offense in several counts. The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *Id.* (internal quotation marks and citation omitted). In assessing whether multiplicity exists, this court considers "whether each offense requires proof of

---

[3] In her brief, Nowlin also conclusorily argues that the district court erred in denying her requested jury instructions as to good faith, violation of a regulation not being a violation of a criminal law, and a witness having a criminal history. However, at oral argument, Nowlin's counsel abandoned these issues and we therefore do not address them.

an element that the other does not." *Njoku*, 737 F.3d at 67 (internal quotation marks and citation omitted).

This court has, at least, twice rejected the argument presented by Nowlin that multiplicity occurs when the Government charges a defendant with both conspiracy to commit health care fraud under 18 U.S.C. § 1349 and conspiracy to violate the Anti-Kickback Statute under 18 U.S.C. § 371. *See Njoku*, 737 F.3d at 67; *Jones*, 733 F.3d at 584. As we explained in *Njoku*:

> The two convictions involve two conspiracies, one under 18 U.S.C. § 1349 and the other under 18 U.S.C. § 371. One statute requires that the government prove an additional fact that the other does not. Section 1349 requires proof of a conspiracy to commit an offense of fraud and that such fraud is the object of the conspiracy. Section 371 prohibits two or more persons from conspiring to commit any offense against the United States. Further, Section 371 requires proof of an overt act, which Section 1349 does not.

737 F.3d at 67. Nowlin has presented no persuasive argument as to why *Njoku* and *Jones* do not foreclose her multiplicity arguments. Accordingly, we find no error in the district court's refusal to dismiss the indictment. For the same reason, we reject Nowlin's related argument that the district court erred in refusing to instruct the jury on multiplicitious conspiracies.

## V.

Nowlin also argues that the district court erred in using the term "kickbacks" in its jury instruction related to count six. "We review a properly preserved challenge to a jury instruction for abuse of discretion and consider whether the instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Montgomery*, 747 F.3d 303, 308 (5th Cir. 2014) (internal quotation marks and citation omitted). "But even if the jury instruction was erroneous, we will not reverse if, in light of the entire

record, the challenged instruction could not have affected the outcome of the case." *Id.* (internal quotation marks and citation omitted).

In its instructions to the jury, the district court explained that count six charged Nowlin with "conspiring to: knowingly and willfully offer or pay remuneration (including any kickback) directly or indirectly, overtly or covertly, in cash or in kind to induce the referral of an individual to a person for furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the Medicare and Medicaid programs in violation of Title 42, U.S.C. § 1320a-7b(b)(2)(A); that is, to pay for Medicare and Medicaid patients." In so doing, the district court largely tracked the language of the statute itself. *See* 42 U.S.C. § 1320a-7b(b)(2)(A) ("whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony . . . ."). We perceive no error in the district court's instruction and therefore reject Nowlin's argument.

**VI.**

Nowlin also argues that a prosecutor committed reversible error by improperly commenting on her failure to testify in violation of the Fifth Amendment.

On the second day of trial, the Government called Daniel Castillo, who had previously worked as a Medicaid fraud investigator on the Yellabone investigation. During cross examination, defense counsel began to question Castillo about a 2006 report, which was prepared by another agent and which included details of a prior interview with Nowlin. Specifically, defense counsel

questioned Castillo regarding certain information contained in the report related to Nowlin's answers about her educational and employment history. In response, the prosecutor made the following objection which is the focal point of Nowlin's Fifth Amendment argument on appeal:

> Objection, Your Honor. My first objection would be to hearsay, in that the defense counsel is trying to get in statements of the defendant without presenting her as a witness through this report that Investigator Castillo never read—or, excuse me, read, but didn't write. And, also, it's not a direct statement of the defendant.

Defense counsel immediately rephrased the question before the district court could rule upon the objection. Defense counsel then resumed questioning Castillo about Nowlin's responses in the 2006 report. The prosecutor again objected as follows: "Your Honor, I renew my objection to the hearsay statements." The district court overruled the objection and instructed defense counsel "to move on to something else."

On the following day of trial, prior to the jury entering the courtroom, defense counsel moved for a mistrial based on the prosecutor's objection the day prior. Specifically, the following exchange occurred:

> Defense Counsel: In regard to the prosecutor's objection yesterday, that I was attempting to put on my client's testimony through the agent when she may not testify, that was an inadmissible statement by the prosecutor, in that it stepped on my client's Sixth Amendment right to remain silent and we, therefore, object to that and move for a mistrial.
>
> The Court: All right. The motion for mistrial is denied. But I wouldn't go into that anymore.
>
> Government: Certainly. Your Honor, can I bring up one other issue? I mean, we've had this issue repeatedly with [defense counsel] trying to get in statements of his client through various witnesses. You know, it's not a statement of a party opponent as to his client and so we keep making that objection as to hearsay and it just keeps going on and on and on. And I don't know if you

want us to keep making a hearsay objection or if we could maybe get a ruling or an admonishment not to do that anymore.

The Court: Well, part of it—you can make your objection individually, and I will rule on each instance. Some of it may be admissible, some of it maybe not. I can't make a blanket ruling until I understand the context in which the offer occur.

Government: All right.

The Court: The motion for mistrial is denied.

Defense counsel: And in that regard, Your Honor, while we think the hen is out of the henhouse and it's reversible error, we still request the Court to again instruct the jury that my client has the right to remain silent all the way through trial and it's not to be taken against her.

The Court: I've instructed them two or three times already and I'll instruct them at the end. If I mention it right now, it won't serve any additional purpose that I can think of.

On appeal, Nowlin contends that the district court erred in denying her motion for a mistrial based on the prosecutor's comments.

"The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify in a criminal case." *United States v. Montoya-Ortiz*, 7 F.3d 1171, 1178 (5th Cir. 1993) (internal quotation marks and citation omitted). "The test for determining if a constitutional violation has occurred is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990) (internal quotation marks and citation omitted). "The prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark. Both inquiries are properly conducted by reviewing the challenged remarks in context." *United States v. Bohuchot*, 625 F.3d 892, 901 (5th Cir. 2010). Further, because Nowlin failed

to timely object to the prosecutor's remarks by waiting until the following day to move for a mistrial, we review her claim for plain error. *Id*. at 900.

Applying this framework, Nowlin has failed to establish that the prosecutor's comments violated her Fifth Amendment rights. Indeed, viewed "[i]n the context of the case," the prosecutor's statements were clearly intended to articulate a hearsay objection to defense counsel's repeated questioning about Nowlin's statements in the 2006 report. *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996). In light of this "equally plausible explanation," the prosecutor's remarks did not constitute "constitutionally impermissible comments on [Nowlin's] decision not to testify." *Id*. Further, even assuming *arguendo* the prosecutor's comments were improper, Nowlin cannot show that any error affected her substantial rights in light of the district court's repeated instruction to the jury that she had the right not to testify. S*ee Bohuchot*, 625 F.3d at 901 (finding prosecutor's comments could not have affected defendant's substantial rights where the "district court cautioned the jury through instructions that 'no inference or conclusion may be drawn from a defendant's decision not to testify'").

## VII.

Nowlin claims that the district court erred in applying various sentencing enhancements. "[W]e review the district court's factual findings for clear error and its interpretation of the Guidelines *de novo*." *Njoku*, 737 F.3d at 75.

### A. Number of Victims

The district court enhanced Nowlin's offense level by six points pursuant to U.S.S.G. § 2B1.1(b)(2)(C) because the offense involved 250 or more victims. According to Nowlin, the district court erred because the number of victims "is

either one (1), the United States Government, or no more than three (3), Medicare, Medicaid, and Social Security."

Under the Guidelines, a "victim" includes "any individual whose means of identification was used unlawfully or without authority." *See* U.S.S.G. § 2B1.1 cmt. n.4(E); *United States v. Cardenas*, 598 F. App'x 264, 267 (5th Cir. 2015). "'Means of identification' are names and numbers such as social security numbers or dates of birth that are used to identify individuals." *United States v. Onenese*, 542 F. App'x 427, 429 n.6 (5th Cir. 2013).

In this case, the evidence at trial showed that Yellabone filed numerous false claims with Medicare and Medicaid that included beneficiaries' names, dates of birth, and health insurance claim numbers (which generally corresponds to the beneficiary's Social Security Number). At trial, the Government introduced evidence through HHS Special Agent Christine Finnegan that identified more than 250 beneficiaries whose information was used by Yellabone to file false claims. In light of this evidence, we conclude that the district court did not err in applying the six-level enhancement. *See id.* at 429-30.

## B. Aggravating Role

The district court also applied a four-level aggravating role enhancement pursuant to U.S.S.G. § 3B1.1(a), which applies "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

On appeal, Nowlin contends that the district court erred in applying this enhancement because there were less than five persons involved in the criminal activity and there was no evidence that any other Yellabone employees, besides Parnell, did anything criminal. However, contrary to Nowlin's argument, the enhancement can apply even if the criminal activity

involved less than five participants, so long as the defendant was an organizer or leader of a criminal activity that "was otherwise extensive." U.S.S.G. § 3B1.1(a). "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1(a) cmt. n.3.

Contrary to Nowlin's arguments, overwhelming evidence showed that Nowlin exercised a leadership role at Yellabone as the exclusive owner of the company. Further, Parnell testified, *inter alia*, that Nowlin instructed her to bill for supplies that were never delivered and to forge delivery documents. In addition to Parnell's testimony showing that Nowlin closely monitored all aspects of the business, both Benford and Turner testified that Nowlin carefully oversaw the business by, for example, calling the office numerous times per day. Moreover, Turner described Parnell as Nowlin's "flunky," who did "[w]hatever Yolanda told her to do." In sum, given the substantial evidence showing that Nowlin was a "leader" or "organizer" and that the criminal activity was "otherwise extensive," the district court did not err in applying the enhancement. *See Njoku*, 737 F.3d at 77.

### C. Abuse of a Position of Trust

Nowlin also argues that the district court erred in applying a two-level enhancement for abusing a position of trust pursuant to U.S.S.G. § 3B1.3. Specifically, she argues that her position does not fall within the enhancement because it does not qualify as a position of "public or private trust" as contemplated by the Guidelines. *See* U.S.S.G. § 3B1.3.

Section 3B1.3 permits a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner

No. 14-20247

that significantly facilitated the commission or concealment of the offense." Contrary to Nowlin's argument, this Guideline explicitly provides that "it may be employed in addition to an adjustment [for aggravating role]" so long as the enhancement is based on an abuse of trust rather than use of a special skill. *Id.*

This court has previously rejected arguments similar to Nowlin's and held that the owner of a DME company occupies a position of trust within the meaning of § 3B1.3. *See United States v. Miller*, 607 F.3d 144, 148-50 (5th Cir. 2010). We likewise conclude that the district court did not err in applying that enhancement in Nowlin's case.[4]

## VIII.

For these reasons, we AFFIRM Nowlin's convictions and sentence.

---

[4] In her brief, Nowlin also argued that the district court erred in applying an obstruction of justice enhancement. However, at oral argument, Nowlin's counsel expressly conceded that this argument was without merit because the district court actually refused to apply an obstruction of justice enhancement.